[No. C043040. Third Dist. May 28, 2004.]

CHRISTO BARDIS et al., Plaintiffs and Respondents, v.
MARVIN L. OATES et al., Defendants and Appellants.

**4**

**COUNSEL**

Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer, Long X. Do; Downey Brand, M. Max Steinheimer and Rhonda Cate Canby for Defendants and Appellants.

Freidberg & Parker and Edward Freidberg for Plaintiffs and Respondents.

## OPINION

**BUTZ, J.**—In this case involving self-dealing, secret markups and clandestine commissions arising out of a real estate partnership, a jury awarded plaintiffs Christo Bardis and Lloyd and Nancy Arnold, a California limited partnership, $165,527.63 in compensatory damages and $7 million in punitive damages against defendants Marvin L. Oates and his corporation A & A Properties, a California corporation.

Defendants launch a twofold attack on the judgment: First, without contesting the factual underpinnings of the jury's finding that they committed fraud and breach of fiduciary duty, defendants claim that plaintiffs failed to show they were damaged and therefore defendants were entitled to judgment as a matter of law. Second, assuming compensatory damages were properly assessed, defendants contend the punitive damages award was so grossly excessive that it must be vacated.

We find no error in the award of compensatory damages. However, in light of recent due process constraints laid down by the United States Supreme Court in *State Farm Mutual Insurance v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*Campbell*), we shall modify the punitive damages award from $7 million to $1.5 million, and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

With a couple of notable exceptions, the facts of this case are not in dispute. We summarize the essential facts upon which the jury based its verdict.

### The Parties

All of the parties are sophisticated real estate investors or entities. Most prominent among them, defendant Marvin "Buzz" Oates (Oates), is a successful real estate developer who owns and controls a family of satellite companies. These include defendant A & A Properties (hereafter A&A), which manages commercial property and also does business as a real estate brokerage under the name Buzz Oates Real Estate (hereafter BORE). BORE is managed and operated by Kevin Ramos (Kevin), son of Frank Ramos (Ramos), a longtime friend and business partner of Oates.

Another prominent entity in Oates's empire is a multipurpose construction company called Buzz Oates Enterprises II (BOE II). Oates owns a controlling interest in both A&A and BOE II, and manages their day-to-day operations.

Plaintiff Christo Bardis (Bardis) is a real estate developer who became a business associate of plaintiff Lloyd Arnold[1] in the 1980's when they were in the harness racing business together.

*Acquisition of the Cypress Property*

In 1989, Bardis and Arnold located an opportunity to purchase and develop a 300-acre tract of land in the Orange County town of Cypress, which included a horse racetrack, golf course and industrial area. The men believed they could buy the property at a distressed price for a fraction of its estimated potential value. Arnold spoke to Ramos about the deal. Both men thought that bringing the experienced Oates into the venture was a "natural fit."

Bardis, Arnold, Oates and Ramos ultimately formed a partnership to develop the property, which they called the Cypress Development General Partnership (Cypress partnership). The terms of the partnership were memorialized in a 29-page contract (partnership agreement).

The Cypress property was purchased for $71 million. Bardis managed the partnership from 1989 to 1994, when Oates took over as manager. By then, the partnership had sold enough of the tract to recover its investment and pay off its debt, while retaining 40-plus acres of commercial property which the partners expected to sell off in parcels at an enormous profit.

*Dissolution of the Cypress Partnership and Formation of TIC*

In 1997, the Cypress partnership dissolved and the partners distributed the remaining parcels. Bardis and Arnold took parcels 7, 8 and 9, while Oates, Ramos and an Oates-controlled entity named OBF received parcels 1, 4, 5 and 6. The four Cypress partners took title as tenants in common to parcels 2 and 3. With respect to parcels 2 and 3, the partnership agreement was replaced by a written tenancy in common (TIC) agreement.

*The Cypress Partnership and TIC Agreements*

Under the Cypress partnership agreement, all major decisions affecting the partnership were to be made by majority vote of the partners. The managing partner had primary responsibility for day-to-day management of the partnership business. In addition to his share of the profits, the managing partner was permitted to receive cash disbursements "as may, from time to time, be approved by unanimous vote of all Partners in order to defray any general

---

[1] Lloyd Arnold is the general partner of plaintiff Lloyd and Nancy Arnold Limited Partnership and signed partnership documents on its behalf (collectively referred to as Arnold).

office and additional expenses incurred by the Managing Partner in the administration of his duties." The partnership agreement further provided that if any partner or affiliate performed services for the partnership as an employee or independent contractor, he was to be compensated at the same rate as would be paid for providers of such services in the community. However, all expenses payable to the managing partner had to be approved by a majority vote of the partnership.

Unlike the Cypress partnership agreement, the 1997 TIC agreement disclaimed "any intention to create a partnership or joint venture." The agreement obligated each cotenant to pay the expenses arising from the property in proportion to his ownership share. It also authorized the "Lead Co-Tenant" to manage the properties and compensated him at the rate of $500 per month for carrying out such duties. Oates was designated as the "Lead Co-Tenant." As with the Cypress partnership, Oates utilized A&A to manage the TIC.

*Management Fees*

Despite the clause of the partnership agreement requiring a majority vote for any payment of compensation for services to the managing partner, during the time Oates was managing partner, A&A charged a fee of $500 per month for "managing" the Cypress properties. Oates admittedly never asked for a vote authorizing payment of the monthly fee. Although he acknowledged he lacked authority to charge the partnership a fee and was aware that Bardis had never charged for his time and efforts while he managed the property, Oates tried to justify the management fee at trial by asserting that it represented less than what it actually cost him to manage the Cypress tract.

*The Markups*

While managing the Cypress partnership and the TIC, A&A routinely received invoices from vendors. However, instead of paying the invoices directly, A&A tendered them to BOE II, a division of A&A, which marked up the invoices by 5 percent or more, and wrote a check for the marked-up amount from partnership funds. For example, a water bill for $97,673 for the partnership was submitted to BOE II; BOE II added a markup charge of $4,883 and charged the partnership $102,556 for the same bill. This practice was applied to bills of all sizes.

The markup percentages for the services of Bruce Kemp, an engineering consultant, and Gordon Egan, a contract attorney, were even steeper than those for routine bills: BOE II marked up Kemp's services by 100 percent, while the fee for Egan's services was marked up 50 percent.

Oates concealed the markups from Bardis and Arnold. At trial, he claimed the markups enabled A&A to recoup "overhead" costs. However, no one at A&A ever did an analysis to determine what the actual overhead costs were.

## The Ewing Commission

In January 1998, Kemp brought to Kevin Ramos of BORE a prospective buyer for parcel 2 of the Cypress tract, Ewing Development Company (Ewing). Previously, Bardis had made it abundantly clear that he was not going to allow Oates or BORE to receive a realtor's commission on the sale of TIC properties.

Although no broker handled the transaction on behalf of Ewing, Kevin associated Bob Goodmanson and his company CB Commercial (CB), whose offices were near the Cypress property, to handle the sale. Kevin and Goodmanson had a prior understanding that CB would help market the property and earn a share of any eventual commission earned by BORE.

On March 18, 1998, Kevin sent a memo to the four TIC owners, setting forth the terms of a proposed sale to Ewing. The memo recited that CB would receive a 4 percent commission. This recitation, according to Kevin's trial testimony, was an intentional misrepresentation. In fact, Kevin had secretly agreed to split the seller's commission with Goodmanson, so that BORE would get 60 percent of it and CB 40 percent. The commission split agreement was concealed for the purpose of deceiving Bardis.

All the TIC owners approved the sale to Ewing under the terms proposed by Kevin. The deliberately false statement that CB would receive the entire commission on the Ewing sale appeared on the written purchase agreement as well as the closing escrow statement.

CB received a 4 percent commission on the Ewing sale, or $203,484.44. It then sent BORE a check for the agreed-upon kickback in the amount of $122,090.

## The Cottonwood Commission

In June 1999, the last remaining parcel of TIC property was sold to Cottonwood Christian Center (Cottonwood). However, the Cottonwood offer included not only TIC-owned parcel 3, but also adjacent parcels 4, 5 and 6, which were owned by Ramos and Oates.

Goodmanson had procured Cottonwood as the buyer, which was represented by its own realtor, Cushman & Wakefield. Kevin recognized that

Goodmanson's contribution toward the Cottonwood sale was at least equal to his own, and that the sale of parcels 3, 4, 5 and 6 was an indivisible transaction. Thus, he initially considered an agreement that called for the seller's commission on all four parcels to be split equally, 1 percent to CB and 1 percent to BORE. However, Kevin knew there would be a problem with Bardis if BORE received any commission on TIC property.

In order to avoid a conflict with Bardis that might affect the transaction, Kevin renegotiated the commission with CB and Goodmanson. The deal was restructured so that CB received a 2 percent seller's commission on parcel 3 and BORE received a 2 percent seller's commission on parcels 4, 5 and 6.[2] The net effect of the side agreement was to shift the obligation to pay CB's commission solely onto the TIC parcel, while BORE received its full commission from the Oates-Ramos parcels.

Although the sales agreement for parcel 3, signed by all TIC partners, showed a 2 percent seller's commission being paid to CB, plaintiffs were not told about the commission-shifting agreement between Kevin and Goodmanson. Had Bardis known about this secret deal, he would have vetoed the Cottonwood sale.

*Jury Verdict and Posttrial Motions*

Through a series of answers to special interrogatories, the jury found defendants in violation of both tort and contract duties as a result of each of the above-described transactions. The table below summarizes the jury's special findings in favor of plaintiffs as to each legal theory of relief:

| Transaction | Cause of Action—Theory of Liability |
|---|---|
| Ewing Commission | Intentional Interference with Economic Advantage, Intentional Misrepresentation, Frauduolent Concealment, Intentional Breach of Fiduciary Duty (Oates and A&A) |
| Cottonwood Commission | Intentional Interference with Economic Advantage, Intentional Misrepresentation, Fraudulent Concealment, Intentional Breach of Fiduciary Duty (Oates and A&A) |

---

[2] The typewritten Cottonwood sales agreement recited that the commission on parcels 4, 5 and 6 was to be split between CB and BORE, with each receiving 1 percent. Just before closing, however, Kevin changed it by hand so that BORE got 2 percent and CB got nothing. Oates signed the agreement following this modification.

| Markups of invoices and payment of invoices and management fees —Cypress Partnership | Intentional Breach of Fiduciary Duty (Oates and A&A) |
|---|---|
| Markups of invoices—TIC | Breach of Contract (Oates only) |

As a consequence of the above misconduct, the jury found that plaintiffs were damaged in the amount of $165,527.63.[3] The jury also found, by clear and convincing evidence, that Oates and A&A were guilty of malice, fraud and oppression. It awarded punitive damages of $5 million against Oates and $2 million against A&A.

Defendants' motion for new trial and motion for judgment notwithstanding the verdict were denied.

## DISCUSSION

### I.  Compensatory Damages

Oates and A&A do not deny the operative facts underlying the jury's verdict. Their challenge to the compensatory damages award is not based on a claim that the acts (to which Oates refers as "mistakes") did not occur. Rather, defendants boldly assert that they *did not cause Plaintiffs one penny of injury.*"

■ Damage to the plaintiff is, of course, an essential element to recovery in both tort (Civ. Code, §§ 3333, 3343) and contract (*id.*, § 3300) actions. However, on appeal, the judgment or verdict is presumed correct. (*Harris v. City of Compton* (1985) 172 Cal.App.3d 1, 9 [217 Cal.Rptr. 884].) "[I]t follows . . . that the reviewing court must 'consider the evidence in the light *most favorable to the prevailing party*, giving him the benefit of *every reasonable inference,* and *resolving conflicts* in support of the judgment.' [Citation.] '[T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury.' (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183] . . . .)" (*Ibid.*)

---

[3] The jury also found in favor of plaintiffs and against Oates on all counts of his cross-complaint. On appeal Oates has not challenged the portion of the judgment that found against him on his cross-complaint.

With these principles in mind, we consider defendants' challenges to the compensatory damages award.

## A.    Management Fees Paid to A&A

Oates and A&A challenge the jury's finding regarding management fees, which Oates secretly charged to the Cypress partnership without authorization or vote of the partners.[4]

Claiming that the fees were "disclosed" on monthly financial reports issued to the partners, Oates concludes that the partners acquiesced to and/or ratified the fees as a matter of law. This is not so.

■    The jury was instructed, in accordance with the partnership agreement, that Oates could be compensated for services as an employee or independent contractor *only* by majority vote of the partners. Waiver of a contractual right is ordinarily a question of fact. (*Luck v. Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 25 [267 Cal.Rptr. 618].) The jury was instructed on the elements of waiver, yet found against Oates. The jury's implied finding against a waiver must be upheld as long as it was supported by substantial evidence. This is the case here.

■    Waiver is the intentional relinquishment of a known right. (*Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 49 [57 Cal.Rptr.2d 687, 924 P.2d 996].) Oates introduced no evidence that the partners were personally aware that he was appropriating a monthly management fee and either ratified or consented to it. That such a fee might have shown up as a line item on various monthly partnership financial statements falls well short of establishing a waiver as a matter of law.

## B.    The Markups

The evidence showed that, in managing the Cypress partnership, Oates used BOE II as a dummy middleman to mark up invoices for goods and services. As a result, instead of paying the face amount of the invoices, the partnership was charged a secret markup, which was funneled directly into an Oates-controlled company. (See p. 7, *ante.*)

---

[4] A $500-per-month management fee was expressly authorized by the TIC agreement. Thus, the compensatory damages award did not include TIC management fees.

Defendants claim they are not liable in damages for the markups because (1) the markups merely reimbursed BOE II for overhead costs, and (2) the partnership agreement allows the managing partner the right to reimburse himself for "general office and additional expenses." These arguments fail.

First, the predicate for defendants' argument that the markups constituted reimbursement for overhead costs is based solely on Oates's own testimony. As the judges of credibility, the jurors were entitled to reject even uncontradicted testimony in its entirety, as long as there was a rational basis for doing so. (*Pescosolido v. Smith* (1983) 142 Cal.App.3d 964, 970–971 [191 Cal.Rptr. 415].) Oates's failure to back up his assertion with hard evidence, along with his history of misappropriation and deception in other transactions, provided such a rational basis.

Second, Oates's assertions fail to account for the duties he undertook by virtue of his fiduciary relationship to the other partners. (*Cagnolatti v. Guinn* (1983) 140 Cal.App.3d 42, 48 [189 Cal.Rptr. 151] (*Cagnolatti*); see Corp. Code, § 16404.) "Partnership is a fiduciary relationship, and partners are held to the standards and duties of a trustee in their dealings with each other. ' " 'Partners are trustees for each other, and in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation, concealment, threat or adverse pressure of any kind.' [Citations.]" ' [Citation.] Moreover, this duty extends to all aspects of the relationship and all transactions between the partners. ' "Each [partner] occupie[s] the position of a trustee to the other with regard to all the partnership transactions, including the transactions contemplated by the firm and constituting the object or purpose for which the partnership was formed." ' [Citation.]" (*BT-I v. Equitable Life Assurance Society* (1999) 75 Cal.App.4th 1406, 1410–1411 [89 Cal.Rptr.2d 811], citing *Leff v. Gunter* (1983) 33 Cal.3d 508, 514 [189 Cal.Rptr. 377, 658 P.2d 740].) " ' "A partner has no right to deal with partnership property other than for the sole benefit of the partnership [citation]." ' " (*Cagnolatti, supra,* 140 Cal.App.3d at p. 48, citing *Prince v. Harting* (1960) 177 Cal.App.2d 720, 727 [2 Cal.Rptr. 545], quoting *Llewelyn v. Levi* (1909) 157 Cal. 31, 37 [106 P. 219]; accord *Galardi v. State Bar* (1987) 43 Cal.3d 683, 693 [238 Cal.Rptr. 774, 739 P.2d 134].)

The Cypress partnership agreement is clear that the managing partner or his "affiliate" can receive reimbursement only for "verified and authorized expenses incurred by him in connection with the Partnership business" and then only when authorized by majority vote of the partners. Oates violated these covenants in diverting partnership funds to BOE II through A&A without the knowledge of the other partners. His self-serving, post hoc

explanation that he was reimbursing himself for "overhead" was entitled to, and received, no weight by the jury.

Defendants speculate that *if* Oates had gone to the partners and had asked to be reimbursed for overhead, they "would have been *required* to approve it because the request was commercially reasonable"; any other answer, defendants assert, "would have been a breach of [the partners'] fiduciary duties." The suggestion is that defendants should be absolved from committing fraud and breach of fiduciary duty because of what *might* have occurred had Oates acted properly under a hypothetical set of circumstances. This is nonsense.

As managing partner, Oates was prohibited from engaging in self-dealing in any way, shape or form. (*Cagnolatti, supra,* 140 Cal.App.3d at p. 48.) "The law does not permit a fiduciary to deal with himself in any transaction in his individual capacity [citation]." (*Ibid.,* citing *Estate of Boggs* (1942) 19 Cal.2d 324, 333 [121 P.2d 678].) "Neither a trustee nor any of his agents may take part in any transactions concerning the trust except when a fully informed beneficiary who is free from the trustee's influence authorizes the transaction [citation]." (*Cagnolatti,* at p. 49, italics omitted.)

It is no answer that the proceeds from self-dealing might be deemed "fair compensation" to the faithless partner. " 'Courts will not permit an investigation into the fairness or unfairness of such a transaction or allow the trustee to show that the dealing was for the best interest of the beneficiaries. It is a trustee's duty in all things to first consider and always to act for the best interests of the trust. [Citation.]' [Citations.]" (*Cagnolatti, supra,* 140 Cal.App.3d at p. 49, quoting *Toedter v. Bradshaw* (1958) 164 Cal.App.2d 200, 208 [330 P.2d 688].)[5]

Defendants' speculations about what *might* have happened are both irrelevant and without evidentiary support. Oates engaged in fraudulent self-dealing and enriched himself and his companies in violation of the partnership agreement and his fiduciary duties. Defendants were obligated to replace those profits, with interest. (*Cagnolatti, supra,* 140 Cal.App.3d at pp. 49–50; *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240–1241 [44 Cal.Rptr.2d 352, 900 P.2d 601]; *Stout v. Turney* (1978) 22 Cal.3d 718, 725–726 [150 Cal.Rptr. 637, 586 P.2d 1228].)[6]

---

[5] The markups charged to the TIC after the demise of the Cypress partnership constituted gains equally as illicit as those skimmed from the partnership. As the jury was correctly instructed, Oates owed the same fiduciary duties to his cotenants as he did to his partners. (See *Wilson v. S.L. Rey, Inc.* (1993) 17 Cal.App.4th 234, 242 [21 Cal.Rptr.2d 552]; *Air Purification, Inc. v. Carle* (1950) 99 Cal.App.2d 258, 264 [221 P.2d 700].)

[6] Defendants' companion claim that the markups were permissible because BOE II would have been able to recover the value of its services on a quantum meruit theory of relief not

## C. *Incorrectly Billed Invoices*

Plaintiffs presented evidence that the Cypress partnership was charged $734.50 for invoices that were not chargeable to the partnership. In response to a special interrogatory, the jury found in favor of plaintiffs "regarding . . . payments for invoices that were not the responsibility of the partnership."

Defendants contend this finding is infirm because plaintiffs did not present evidence that Oates "knew of, or caused," the items to be falsely billed to the partnership. However, Oates admitted the subject billings were incurred for services rendered on a building *he* co-owned, and were not legitimate partnership debts. Based on Oates's pattern of deception and self-dealing, the jury could reasonably infer that he knew these billings were improper, and intended to divert partnership funds to enrich himself. The jury's special verdict on this issue was supported by substantial evidence and may not be disturbed.

## D. *The Ewing Commission*

Defendants next challenge the jury's findings on the secret diversion of the Ewing commission to BORE. While admitting that "[Kevin] Ramos'[s] nondisclosure of the commission division arrangement, and the surreptitious way in which this payment was handled, was inexcusable," defendants contend plaintiffs suffered no harm because the 4 percent realtor's commission paid by the partnership was a "commercially reasonable" rate.

Oates seeks to justify self-dealing and duplicity by urging that his secret profits might be deemed reasonable compensation had it been paid to a third party in an arm's-length transaction. Again he overlooks the provisions in the partnership agreement clearly prohibiting the payment of reimbursement or compensation without a majority vote of the partners. But even without such a clause, Oates was not entitled to pay himself a secret commission from partnership assets: "The rule is '[a]bsent an express agreement, a partner is not entitled to any compensation for his services to the partnership other than his share of the profits' [citation]." (*Cagnolatti, supra,* 140 Cal.App.3d at p. 50, quoting *Wind v. Herbert* (1960) 186 Cal.App.2d 276, 286 [8 Cal.Rptr. 817].)

---

only suffers from the same flaws as their overhead compensation theory, but may not be urged here because it was never raised in the trial court. New theories of defense, just like new theories of liability, may not be asserted for the first time on appeal. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2003) ¶ 8:231, p. 8-113.)

Under established law, the secret profit Oates reaped for himself on the Ewing commission rightly belonged to the TIC. (See *Western States Life Ins. Co. v. Lockwood* (1913) 166 Cal. 185, 190–191 [135 P. 496]; see also Civ. Code, § 2224 ["One who gains a thing by fraud, . . . the violation of a trust, or other wrongful act, is . . . an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it"].) There was no error in requiring defendants to refund the Ewing commission to plaintiffs.

### E.  The Cottonwood Commission

The Cottonwood commission presents a somewhat more complicated deception than the Ewing arrangement. Cottonwood entered into a contract to buy one parcel of TIC property and three adjacent parcels of land owned by Oates and Ramos as a package deal. Since CB procured Cottonwood as a buyer, CB was owed at least a portion of the listing commission on all four parcels.

The buyer's broker, Cushman & Wakefield, received its standard 2 percent commission, so splitting the remaining 2 percent commission equally between BORE and CB *as to all four parcels* was the obviously fair method of allocation.

However, Kevin entered into a secret deal with CB whereby CB took a *2 percent* commission on the parcel owned by the TIC, while the Oates-controlled BORE company took its commission on the sale of the three parcels owned by Oates and Ramos. The net effect of this arrangement was to place an unequal burden of the seller's commission on the TIC partners, while allowing Oates to avoid paying any commission to CB on the sale of the property he co-owned with Ramos.

But, Oates replies, there was no evidence that paying a 4 percent total commission on a commercial land sale such as this was unreasonable. Therefore, he asks rhetorically, "Where's the beef?"

The "beef" is that Oates shifted the CB-earned commission, which should have been borne equally by the owners of all four parcels, exclusively onto the TIC owners. By practicing this deception, Oates also enriched himself, since the commission paid on the three Oates-Ramos parcels was funneled entirely to an Oates-controlled real estate brokerage.

The jury could reasonably have concluded that Oates owed a fiduciary duty not to make a secret profit at the expense of his cotenants on the TIC parcel. As the California Supreme Court declared: " 'When one undertakes to deal with himself in different capacities—individual and representative—there is a

manifest hostility in the position he occupies. His duty calls upon him to act for the best interests of his principal; his self-interest prompts him to make the best bargain for himself. Humanity is so constituted that when these conflicting interests arise the temptation is usually too great to be overcome, and duty is sacrificed to interest. In order that this temptation may be avoided, or, if indulged in, must be at the peril of the trustee, it has been wisely provided that the trustee shall not be permitted to make or enforce any contract arising between himself as trustee and individually with reference to any matter of the trust, nor will the court enter into any examination of the honesty of the transaction.' " (*Western States Life Ins. Co. v. Lockwood*, *supra*, 166 Cal. at p. 191.)

Defendants' assertion that a 4 percent real estate commission was commercially reasonable for the Cottonwood sale is beside the point. Just as an "agent [who] conceals his interest in property sold or buys property for his principal at a price less than he charges his principal, . . . must disgorge the secret profit even if the property is worth the larger amount and the principal was willing to pay it" (*Wade v. Diamond A Cattle Co.* (1975) 44 Cal.App.3d 453, 458 [118 Cal.Rptr. 695]), Oates may not avoid liability for the secret profit he made as a result of a fraudulent breach of fiduciary duty on the excuse that his cotenants might have paid a comparable sales commission to an outside broker.

### F. Conclusion

We find no error in the award of compensatory damages and shall affirm the compensatory damages portion of the judgment.

## II. Punitive Damages

Defendants claim the punitive damages awarded by the jury—$5 million against Oates personally and $2 million against his property management company, A&A, were plainly excessive and violated the state and federal Constitutions.

We note at the outset that defendants tender no separate argument challenging the *propriety* of punitive damages. Accordingly, we accept as true, for purposes of this appeal, the jury's finding that Oates and A&A "committed malice, oppression or fraud" in the conduct which forms the basis of the compensatory damages award.

### A. The Calculation of Ratio

Before turning to the merits of the arguments against the punitive damages award, it is necessary to dispose of a hotly contested issue to which the parties devote much briefing, but which we believe can be resolved without much difficulty: the proper compensatory damages figure to be used in determining the ratio of punitive damages to actual damages as found by the jury.

The answer can be found in the special verdict form, which asked the jury: "If you found any defendant liable to plaintiffs, *what do you find to be the total amount of damages suffered by plaintiffs* as a result of the conduct upon which you base your finding of liability?" (Italics added.) The jury's answer was $165,527.63. The basis for the damages figure is easily ascertainable from an examination of plaintiffs' exhibit 326. The exhibit contains an itemized list of nine categories of economic damages, together with interest accrued on each item of damage. Plaintiffs' damages expert testified that simple interest was calculated at the legal rate of 7 percent from the date of the transaction to the time of trial. If we eliminate the item "Expenses Without Documentation" set forth on exhibit 326, the jury's special verdict figure matches exhibit 326 to the penny.[7]

Defendants would have us exclude the prejudgment interest component of the award. Plaintiffs would include such additional amounts as attorney fees and costs, damages caused to hypothetical plaintiff Frank Ramos, and even "damages . . . caused by defendants' pattern of misconduct to *other* partners in *other* partnerships." (Italics added.)

We reject both formulations. "Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. [Citations].' [Citation.]" (*Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1059 [134 Cal.Rptr.2d 358] (*Marron*), italics omitted, quoting *Cooper Ind. v. Leatherman Tool Grp.* (2001) 532 U.S. 424, 432 [149 L.Ed.2d 674, 684, 121 S.Ct. 1678] (*Cooper Industries*).) The idea behind looking at ratios is that "[p]unitive damages must bear a reasonable relationship and be proportionate to the actual harm suffered by the plaintiff (i.e., compensatory damages)." (*Marron, supra,* at pp. 1059–1060; see also *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 580 [134 L.Ed.2d 809, 116 S.Ct. 1589] (*Gore*).) Logic and common sense tell us that the amount the jury found to be the *"total amount of damages suffered by plaintiffs"* (italics added)—$165,527.63—most closely

---

[7] The total damages figure on exhibit 326, including interest, is $254,312.41. The item "Expenses Without Documentation" including accrued interest, is $88,784.78. The difference between the two figures, $165,527.63, is the precise amount the jury awarded.

reflects the United States Supreme Court's formulation of the "actual harm as determined by the jury" (*Gore, supra,* 517 U.S. at p. 582 [134 L.Ed.2d at p. 830]), and should be used as the base figure in calculating the ratio for punitive damages.

### B. Due Process Under Campbell

■    A party challenging a punitive damages award is entitled to de novo review by the appellate court to ensure the award is not excessive under the due process clause of the federal Constitution. (*Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115, 1149–1150 [122 Cal.Rptr.2d 139] (*Romo I*), citing *Cooper Industries, supra,* 532 U.S. at pp. 431–433 [149 L.Ed.2d 674, 683–684].)

Until relatively recently, the United States Supreme Court maintained a "hands off" policy in examining state punitive damages awards under the constitutional microscope.

As recently as 1989, the high court held that "neither the Excessive Fines Clause of the Eighth Amendment nor federal common law circumscribed awards of punitive damages in civil cases between private parties." (*Campbell, supra,* 538 U.S. at p. 430 [155 L.Ed.2d at p. 609] (dis. opn. of Ginsburg, J.), citing *Browning-Ferris v. Kelco Disposal* (1989) 492 U.S. 257, 262–276, 277–280 [106 L.Ed.2d 219, 230–239, 239–241, 109 S.Ct. 2909].) Two years later, in *Pacific Mutual Life Insurance Company v. Haslip* (1991) 499 U.S. 1 [113 L.Ed.2d 1, 111 S.Ct. 1032], the Supreme Court warned that "unlimited jury [or judicial] discretion . . . in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." (*Id.* at p. 18 [113 L.Ed.2d at p. 20].) Nevertheless, the court upheld a punitive damages award "more than 4 times the amount of compensatory damages, . . . more than 200 times [the plaintiff's] out-of-pocket expenses," and "much in excess of the fine that could be imposed." (*Id.* at p. 23 [113 L.Ed.2d at p. 23].) This was followed by *TXO Production v. Alliance Resources* (1993) 509 U.S. 443 [125 L.Ed.2d 366, 113 S.Ct. 2711] (*TXO*), wherein the Supreme Court affirmed a state court "$10 million punitive damages award—an award 526 times greater than the actual damages awarded by the jury." (*Id.* at 453 [125 L.Ed.2d at p. 376] (lead opn. of Stevens, J.).) Still, the court obviously struggled with the size of the award in what Justice Kennedy described as a "close and difficult" case. (*Id.* at p. 468 [125 L.Ed.2d at p. 386] (conc. opn. of Kennedy, J.).) The factors that tipped the scales in favor of the plaintiff were that the defendant's conduct was part of a "larger pattern of fraud, trickery and deceit" and that while the actual damages were low, they would have been many times greater had the defendant gotten away with its "malicious and fraudulent" scheme. (*Id.* at p. 462 [125 L.Ed.2d at p. 382] (lead opn. of Stevens, J.).)

In *Gore, supra,* 517 U.S. 559 [134 L.Ed.2d 809], the Supreme Court finally found a punitive damages award that it felt crossed the constitutional line. There, the justices reviewed a $2 million punitive damages award rendered on a verdict of only $4,000 in compensatory damages. The shock value of defendant's conduct in *Gore,* however, was minimal—a car manufacturer had concealed the fact that it repainted new vehicles whenever they sustained minor damage prior to shipment to the dealer. (*Id.* at pp. 563–565 [134 L.Ed.2d at pp. 819–820].) Worse still, the conduct was legal in a number of other states, prompting the high court to admonish that "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." (*Id.* at p. 572 [134 L.Ed.2d at p. 824].)

█ In *Gore,* the Supreme Court fashioned three "guideposts" for appellate courts to employ when assessing whether a punitive damages award comports with federal due process requirements: (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. (*Gore, supra,* 517 U.S. at pp. 574–575 [134 L.Ed.2d at p. 826].)

Applying its newly minted test, the *Gore* majority found that the punitive damages award, more than 500 times the "actual harm as determined by the jury," transcended constitutional limits, especially in the absence of any suggestion the plaintiff or other car purchasers were threatened with additional potential harm as a result of BMW's conduct. (*Gore, supra,* 517 U.S. at pp. 582, 585–586 [134 L.Ed.2d at pp. 830, 833].)

If, in *Gore,* the high court threw a lasso around the problem of what it had previously identified as "punitive damages awards ' "run wild" ' " (*TXO, supra,* 509 U.S. at p. 475 [125 L.Ed.2d at p. 390]), in *Campbell* it tightened the noose considerably.

In *Campbell,* the justices threw out a $145 million punitive damages award based on $1 million in compensatory damages. The case involved State Farm Mutual Automobile Insurance Company, which the jury found engaged in bad faith, fraud and intentional infliction of emotional distress in refusing to settle a third party claim for the policy limits, ignoring the advice of their own investigators. (*Campbell, supra,* 538 U.S. at pp. 413–414 [155 L.Ed.2d at p. 598].) Plaintiffs introduced evidence that the conduct was part of a nationwide pattern of bad faith practices, including denying liability and capping payouts, in an effort to boost corporate profits. (*Id.* at p. 415 [155 L.Ed.2d at p. 599].)

The United States Supreme Court reversed. The court again applied the *Gore* guideposts, but this time delineated several "substantive constitutional limitations" on punitive damages awards (*Campbell, supra,* 538 U.S. at p. 416 [155 L.Ed.2d at p. 600]). These limits may be summarized as follows: The reprehensibility of the defendant's conduct is the *most important* of the three factors. (*Id.* at p. 419 [155 L.Ed.2d at p. 602].) To this end, the court broke down the reprehensibility factor into five subfactors, which we shall discuss later in this opinion.

With respect to the relationship between the compensatory damages and the punitive damages award, the court again declined to impose any bright-line ratios. However, it cautioned that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*Campbell, supra,* 538 U.S. at p. 425 [155 L.Ed.2d at pp. 605–606].) Conversely, lower ratios—perhaps as low as one to one—may "reach the outermost limit of the due process guarantee" where "compensatory damages are substantial." (*Ibid.* [155 L.Ed.2d at p. 606].) In any event, the "precise award . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*Ibid.*) Finally, the wealth of the defendant, while relevant, "cannot justify an otherwise unconstitutional punitive damages award," nor can it make up for the lack of other factors such as reprehensibility. (*Id.* at pp. 427–428 [155 L.Ed.2d at p. 607].)

The *Campbell* court ruled that the punitive damages award, which bore a ratio of 145 to 1 to the compensatory damages, violated due process. Two factors heavily underscored this assessment: (1) the plaintiffs' attorneys impermissibly used the case "as a platform to expose, *and punish*, the perceived deficiencies of State Farm's operations throughout the country" (*Campbell, supra,* 538 U.S. at p. 420 [155 L.Ed.2d at p. 602], italics added), and (2) the plaintiffs were awarded substantial compensatory damages, including those for emotional distress resulting from outrage and humiliation, which tended to duplicate elements of the punitive damages award. (*Id.* at p. 426 [155 L.Ed.2d at pp. 606–607].) The court also noted that the maximum state civil penalty for the wrong done to the Campbells was $10,000, an amount "dwarfed" by the large punitive damages verdict. (*Id.* at p. 428 [155 L.Ed.2d at p. 608].)

The shock waves from *Campbell* have already reverberated in the appellate courts of California. In *Romo I, supra,* 99 Cal.App.4th 1115 and *Romo v. Ford Motor Co.* (2003) 113 Cal.App.4th 738 [6 Cal.Rptr.3d 793] (*Romo II*), Ford Motor Company willfully and consciously ignored the dangers to human life inherent in its Bronco design, resulting in the deaths of three persons. Ford "ignored its own internal safety standards, created a false appearance of

the presence of an integral roll-bar, and declined to test the strength of the roof before placing it in production." (*Romo II, supra,* at p. 755, citing *Romo I, supra,* at p. 1148.) On remand after *Campbell,* the Court of Appeal, Fifth Appellate District, in *Romo II* struck down a $290 million punitive damages verdict issued on a compensatory damages award of $4.5 million. (*Romo II,* at p. 763.) Even though it found Ford's conduct "highly reprehensible" (*id.* at p. 755), the court could not constitutionally justify such a sum. The appellate court ordered a remittitur reducing the punitive damages award to $23.7 million or five times the total compensatory damages figure. (*Id.* at p. 763.)

And in *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1056–1057 [135 Cal.Rptr.2d 736] (*Diamond Woodworks*), a punitive damages award against an insurance company found guilty of bad faith, fraud and breach of contract bearing a 21-to-1 ratio to the actual damages as found by the appellate court was reduced to $1 million, or approximately 3.8 times the fraud compensatory figure.

## C.  Application of Campbell to This Case

We now proceed to analyze the present punitive damages award of $7 million[8] to see whether it comports with due process in light of the factors laid out in *Campbell.*

### 1.  *Reprehensibility*

The degree of reprehensibility has been called " '[t]he most important indicium of the reasonableness of a punitive damages award . . . .' " (*Campbell, supra,* 538 U.S. at p. 419 [155 L.Ed.2d at p. 602].) In weighing reprehensibility, *Campbell* lists five subfactors, i.e., whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of "intentional malice, trickery, or deceit, or mere accident." (*Ibid.*)

---

[8] We combine the punitive damages awards of $5 million against Oates and $2 million against A&A together for two reasons. First, defendants do not dispute that Oates was the manager and principal owner of A&A, and there is no compelling reason, on this record, to maintain strict culpability lines between the two defendants. Second, the jury found defendants jointly liable for a single compensatory damages figure. Any reasoned proportionality analysis must therefore compare the *total* amount of economic harm to plaintiffs with the *total* punitive damages verdict. We are mindful of the jury's allocation of punitive damages however, and it will be reflected in our disposition.

The first three of these factors do not favor an extremely high punitive damages award: All of the harm caused by defendants here was economic. None of it involved reckless endangerment to health or safety. Nor is it accurate to characterize plaintiffs, who were fellow investors with Oates in a multimillion-dollar land speculation deal, as financially vulnerable.

On the other hand, the fourth and fifth factors favor a high-end punitive damages award. The jury could find that the kickbacks, markups and concealed commissions were part of a systematic pattern by Oates of bilking his partners out of funds legitimately belonging to the partnership. He repeatedly fleeced the partnership to line his own pockets. Oates was unrepentant at trial, insisting that "in [his] heart" be believed he did nothing wrong. The record also overwhelmingly supports a finding that the harm was caused as the result of intentional fraud, malice and deceit. Indeed, BOE II, a division of A&A, seems to have been set up as a middleman operating primarily for the purpose of skimming off profits for Oates's enrichment.[9]

We conclude that the conduct the jury sought to punish here was of high, but not extreme reprehensibility.

### 2. *Ratio*

The second factor to consider is the relationship between the punitive damages award and the actual harm suffered, as reflected in the jury's award of compensatory damages. Here, the combined punitive damages award was $7 million and the compensatory damages award was $165,527.63, a ratio of more than 42 to 1. In light of the United States Supreme Court's declaration that "few awards" exceeding a single-digit ratio "will satisfy due process" (*Campbell, supra,* 538 U.S. at p. 425 [155 L.Ed.2d at pp. 605–606]), this ratio cannot stand unless extraordinary factors are present.

*Campbell* notes three possible exceptions to the single-digit ratio rule: where " 'a particularly egregious act has resulted in only a small amount of economic damages,' " where " 'the injury is hard to detect,' " or where " 'the monetary value of noneconomic harm might have been difficult to determine.' " (*Campbell, supra,* 538 U.S. at p. 425 [155 L.Ed.2d at p. 606], quoting *Gore, supra,* 517 U.S. at p. 582 [134 L.Ed.2d at p. 831.)

We find no basis for concluding that the injury was especially hard to detect. Only measurable economic damages resulted. Nor can we say with

---

[9] There was evidence in the record that Oates's net worth was between $600 and $800 million. A Forbes magazine article ranked Oates 288th on a list of the nation's 400 wealthiest individuals, estimating his worth at some $800 million. Oates testified that he was misquoted—he assertedly told Forbes he was worth only $600 to $650 million.

confidence, as in *TXO*, that this is a case where plaintiffs would have sustained far more damages had Oates's deceptive conduct not been unveiled.

Plaintiffs argue that the damage caused to them was only the tip of the iceberg because Oates was responsible for unauthorized markups which defrauded hundreds of other partnerships. The claim is unpersuasive, both on the facts and the law.

To support their assertion, plaintiffs refer us to a stack of invoice exhibits that they claim, without citation to the reporter's transcript, demonstrate improper markups for 119 other Oates partnerships. Taking the average markup percentage from the record in this case, they surmise that Oates must have generated for himself markups of over $4.5 million on other transactions.

However, the jury was not made privy to the contractual arrangements Oates had with other partnership entities; nor did the instructions allow them to consider damages suffered by others. Furthermore, to include speculative damages suffered by other potential plaintiffs in the calculus would run directly contrary to the Supreme Court's admonition in *Campbell* that "[a] defendant should be punished for the *conduct that harmed the plaintiff*, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims . . . ." (*Campbell, supra,* 538 U.S. at p. 423 [155 L.Ed.2d at p. 604], italics added.) We therefore refuse to add into the equation any monetary losses that Oates might have wrought on third parties not involved in this lawsuit.

Nevertheless, we believe it is fair to say the amount of damages suffered by plaintiffs was relatively small in comparison to the seriousness of defendants' conduct. The jury verdict leaves no doubt that Oates committed egregious misconduct. The judgment is not based on occasional transgressions; nor was it the product of negligence or sloppy accounting. Fraud and breach of fiduciary duty are universally deplored throughout our society; the jury's award reflects its repugnance at the intentional, oppressive and malicious conduct practiced here. Thus, in our view the compensatory damages figure does not fully reflect the blameworthiness of the acts condemned by the jury. In this respect, our case is a stronger candidate for a high punitive damages verdict than *Romo II*, for example, where the appellate court struck down a double-digit ratio primarily because the plaintiffs had been made whole by large compensatory damages awards, including those for emotional distress.

### 3. *Civil and criminal penalties for like conduct*

The final *Campbell* factor is the difference between the punitive damages awarded by the jury and other civil penalties authorized or imposed in comparable cases. (*Campbell, supra,* 538 U.S. at p. 428 [155 L.Ed.2d at pp. 607–608].) While the "violation of common law tort duties . . . do not [easily] lend themselves to a comparison with statutory penalties" (*Continental Trend Resources, Inc. v. OXY USA Inc.* (10th Cir. 1996) 101 F.3d 634, 641), we do note that California typically imposes treble damages penalties for fraudulent and bad faith conduct. (See Civ. Code, §§ 1947.10 [fraudulent intent to occupy rental premises], 1738.15 [willful failure to pay commissions], 1057.3, subd. (b) [bad faith refusal to release escrow deposit], 1719, subds. (a)(2), (3) [writing a dishonored check without good faith dispute as to the debt].) Likewise, in instances involving harm to real property, actual damages may be trebled for injury to trees, waste to real property and forcible or unlawful entry to a building or real property. (See Code Civ. Proc., §§ 732, 733, 735.) Where intentional acts of fraud are involved, ratios of at least 3 to 1 appear to be called for.

Our discussion on this point would not be complete without the observation that California also imposes substantial *criminal* penalties for embezzlement and breach of fiduciary duty. (See Pen. Code, §§ 484 [theft], 503 [embezzlement], 506 [entrusted with property of another; fraudulent intent to appropriate], 514 [punishment].) Embezzlement of more than $400 constitutes grand theft, which may carry a state prison sentence. (*Id.,* §§ 514, 487.) "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of more than one hundred thousand dollars ($100,000)" (Pen. Code, § 186.11, subd. (a)(1)), shall receive a consecutive two-year enhancement on any prison sentence imposed when the loss exceeds $150,000 (*id.,* § 12022.6, subd. (a)(2)). The jury here found that defendants reaped over $100,000 in illicit profits through multiple acts of fraud and self-dealing.

Although we are aware that defendants' conduct has not been adjudicated in a criminal proceeding, we take note of these penalties as reflective of "the seriousness with which [our] State views the wrongful action." (*Campbell, supra,* 538 U.S. at p. 428 [155 L.Ed.2d at p. 608].)

### D. *Excessiveness Under State Law*

Defendants also claim the punitive damages award is excessive under California law. Since the punitive damages award must be reduced based on the due process clause of the federal Constitution as interpreted by *Campbell,*

we determine only whether California's Constitution would require a further reduction of the punitive damages beyond that required by the federal Constitution. We conclude it does not.[10]

Under California law, a punitive damages award may be reversed as excessive "only if the entire record, viewed most favorably to the judgment, indicates the award was the result of passion and prejudice." (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1658 [57 Cal.Rptr.2d 525].) "The purpose of punitive damages is a public one—to punish wrongdoing and deter future misconduct by either the defendant or other potential wrongdoers. The essential question for the jury, the trial court, and the appellate courts is whether the amount of the award substantially serves the public interest in punishment and deterrence. The California Supreme Court has established three criteria for making that determination: (1) the reprehensibility of the defendant's misdeeds; (2) the amount of compensatory damages, though there is no fixed ratio for determining whether punitive damages are reasonable in relation to actual damages; and (3) the defendant's financial condition. [Citations.] The wealthier the wrongdoer, the larger the punitive damage[s] award must be to meet the goals of punishment and deterrence. [Citations.]" (*Ibid.*) An award that can simply be written off as part of the cost of doing business does not attain this objective. (See *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 820 [174 Cal.Rptr. 348].) As the state Supreme Court declared, " 'the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.' " (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348].)

Under this standard, no further reduction of the punitive damages award, as modified here in light of *Campbell*, is required.

### E.   Conclusion

Based on the foregoing factors, we conclude that the punitive damages award here cannot exceed the single-digit ratio guidepost set forth in *Campbell* and still survive federal due process scrutiny. As we understand the United States Supreme Court's teachings in *Gore* and *Campbell*, a plaintiff would have to "run the table" on all three evaluative factors in order to sustain a punitive damages award that significantly exceeds a single-digit ratio to the amount of compensatory damages. This case does not meet that

---

[10] The California Supreme Court has granted review in three appellate decisions addressing the issue of punitive damages awards. (*Henley v. Philip Morris, Inc.,* (Cal.App.), review granted Apr. 28, 2004, S123023; *Simon v. San Paolo U.S. Holding Company* (2003) 113 Cal.App.4th 1137 [7 Cal.Rptr.3d 367], review granted Mar. 24, 2004, S121933; *Johnson v. Ford Motor Company*, review granted Mar. 24, 2004, S121723.)

standard. Nevertheless, we believe that an award at the high end of the single-digit ratio spectrum is justified. We explain.

"*Campbell*, *Gore* and *Haslip* all suggest that in the usual case, i.e., a case in which the compensatory damages are neither exceptionally high nor low, and in which the defendant's conduct is neither exceptionally extreme nor trivial, the outer constitutional limit on the amount of punitive damages is approximately four times the amount of compensatory damages." (*Diamond Woodworks, supra,* 109 Cal.App.4th at p. 1057.)

■ In this case, a ratio of greater than four to one is warranted. As we have explained, defendants' fraudulent and deceptive conduct registers high on the reprehensibility meter. Second, as *TXO* vividly illustrates, the fact that only economic injury resulted does not mean that a punitive damages award should not sting. The United States Supreme Court still recognizes that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct [citation] . . . can warrant a substantial penalty." (*Gore, supra,* 517 U.S. at p. 576 [134 L.Ed.2d at p. 827].) Since this is a case in which the amount of compensatory damages does not fully reflect the outrageousness of the behavior, under *Campbell* it merits a ratio higher than four to one.

The United States Supreme Court has consistently recognized that punitive damages serve the twin goals of punishment and deterrence. (See *Campbell, supra,* 538 U.S. at p. 416 [155 L.Ed.2d at p. 600] ["[P]unitive damages serve a broader function; they are aimed at deterrence and retribution"]; *Gore, supra,* 517 U.S. at p. 568 [134 L.Ed.2d at p. 822] ["Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"].)

In order to serve these aims, a punitive damages award must send a message to the offender and others in similar positions that this sort of behavior will not be tolerated. Here, a four-to-one ratio would yield a punitive damages award of only $660,000, less than 1 percent of Oates's net worth according to the evidence most favorable to the judgment. (See fn., *ante.*) When compared to the magnitude of the misconduct, such a figure would be tantamount to a slap on the wrist. We are mindful of *Campbell*'s admonition that the wealth of a defendant will not *by itself* compensate for a lack of other factors. However, we believe the special circumstances described here warrant a higher single-digit ratio.

■ Considering and balancing all of the various due process factors, we conclude that a total punitive damages award of $1.5 million reaches the outermost limit in this case. This yields a ratio slightly exceeding nine to

one—still within the single-digit threshold set out in *Campbell*, yet high enough to serve the goals of punishment and deterrence. We will therefore vacate the punitive damages verdict. Apportioning the $1.5 million between the two defendants to reflect the same culpability as found by the jury yields a reduced punitive damages award of $1,071,450 against Oates and $428,550 against A&A. We shall modify the verdict and affirm the judgment accordingly.

## DISPOSITION

The compensatory damages award is affirmed. The punitive damages award is vacated and the judgment is modified by reducing the punitive damages award to $1,071,450 against Oates and $428,550 against A & A Properties. (Code Civ. Proc., § 43.) As modified, the judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 27(a).)

Scotland, P. J., and Blease, J., concurred.

A petition for a rehearing was denied June 9, 2004, and the petition of both respondents and appellants for review by the Supreme Court was denied September 15, 2004.