[No. C055430. Third Dist. Jan. 28, 2009.]

VINCENT A. MUZZI et al., Plaintiffs and Appellants, v.
BEL AIR MART, Defendant and Respondent.

### COUNSEL

Trainor Fairbrook, John D. Fairbrook and Arthur B. Mark III for Plaintiffs and Appellants.

Jacobson Markham and Patrick T. Markham for Defendant and Respondent.

### OPINION

**HULL, J.**—Defendant Bel Air Mart (Bel Air) is the anchor tenant in a shopping center owned by plaintiffs. After a dispute arose over Bel Air's use of common areas behind the store, plaintiffs filed suit for declaratory relief. The trial court found that Bel Air violated its lease by placing large seasonal storage containers in the center's parking spaces. However, the court also concluded that Bel Air's practice of keeping bread racks and similar items in parking spaces was permissible under lease provisions allowing the use of common areas for the loading and unloading of merchandise.

Plaintiffs raise a number of challenges to the court's decision, including that (1) the court erred in failing to resolve issues related to Bel Air's use of refrigerated trailers, (2) there is insufficient evidence to support the court's determination that the lease permitted the use of parking spaces for food racks, pallets, oil storage containers, and similar items, and (3) Sacramento city ordinances preclude the use of parking spaces for anything other than parking. Plaintiffs also contend that, in any event, the court's judgment must be amended because it did not reflect all of the determinations included in its statement of decision. No cross-appeal has been taken by Bel Air, and the court's ruling prohibiting the use of large seasonal storage containers is not before us.

 We agree with the trial court that the use of the refrigerated trailers in the loading dock was not at issue in this suit. However, we also conclude that

the trial court erred in finding that Bel Air's storage of bread racks and other items in parking spaces was permissible under lease provisions that allow the loading and unloading of merchandise. We reverse that part of the judgment, obviating the need to address plaintiffs' other claims on appeal.

## FACTS AND PROCEEDINGS

In April 1987, Bel Air entered into a lease with the owners of a planned shopping center for approximately 43,000 square feet of space to be used for a grocery store. Bel Air was to have input into the design of the store, including its parking and loading configuration, and it retained the right to approve or reject the final plans. The lease had an initial term of 25 years, with subsequent options to renew for five additional five-year terms.

The shopping center was constructed and Bel Air began its operations. In 1992, Bel Air was acquired by Raley's. (We continue to refer to the store as Bel Air.) In 2001, the shopping center was sold to plaintiffs and the leases were assigned to plaintiffs as part of the sale. Bel Air signed an estoppel certificate, asserting that to its knowledge, there were no defaults under the lease.

A dispute arose between Bel Air and plaintiffs over the use of parking spaces behind the Bel Air store, near one of the store's loading docks. During holiday periods, Bel Air placed large storage containers in this area for its inventory of seasonal items. Other parking spaces in the same area were used for other purposes. For example, deliveries of bread were made five days per week, using rolling racks for the food items. The racks were wheeled into the store, the food was unloaded, and the empty racks were wheeled back into the parking area, and kept there until the next delivery. A similar system of carts was used for milk and ice cream deliveries, and these empty carts were kept in the parking area as well. A large bin filled with used cooking oil was kept in the same area for recycling; a rendering company would come by on a monthly basis to collect the oil. Broken shopping carts were kept in parking spaces to await the every-other-month visit from the repair company. Bel Air also kept other debris, such as discarded display cases, in this area.

Plaintiffs believed that Bel Air's use of these common area parking spaces violated lease provisions.

Because these provisions are critical to this case, we quote them at length. Section 2 of the lease describes the store space rented to Bel Air and also gives Bel Air the *"non-exclusive right to use the Common Area of the*

*Shopping Center* (as modified from time to time, as permitted herein) as provided for and described in Section 9 hereof, including without limitation all of the parking area, roadways, walkways, landscaped areas, malls and service areas . . . ." (Italics added.)

Section 9 of the lease outlines the provisions relating to the center's common area. Section 9.1 defines "Common Area" as "all of the area within the Shopping Center not demised to Tenant and provided by Landlord (as modified from time to time as permitted herein), for the convenience and use of tenants of the Shopping Center, their employees, customers and invitees, including without limitation all of the parking area, roadways, walkways, landscaped areas, malls and service areas . . . ."

Section 9.2 describes the covenants and restrictions relating to the common areas. Section 9.2(a) states: "Subject to the provisions of Section 9.2(d), 9.2(e) . . . , and any interference that may be caused by reasonable maintenance and/or construction activities required or permitted pursuant to the provisions of this Lease, all of the Common Area shall be used for parking, pedestrian, vehicular purposes, access, . . . loading and unloading (subject to reasonable rules as adopted . . .) . . . and such other reasonable purposes customarily undertaken in common areas in quality shopping centers within the Sacramento metropolitan area."

Section 9.2(d) provides in relevant part: "During the term of this Lease and any extension or renewal of such term, Tenant and its customers, business invitees and employees shall have the non-exclusive right with Landlord and with other tenants, their customers, business invitees and employees to use without charge (subject to the provisions of this Lease) all of the parking areas within Common Area for the parking of vehicles and to use roadways, walkways and malls for the purpose of ingress and egress to and from the Premises, including the parking areas, and to use the Common Areas for such other purposes as allowed in accordance with Section 9.2(a) above."

Section 9.2(e) of the lease gives the landlord the authority to permit "business endeavors and/or structures" in the common area if certain conditions are met.

The lease also contains a "no waiver" provision in section 43, which states in relevant part: "No waiver of any default or breach of any term, covenant or condition by either party hereunder shall be implied [from] an omission by either party to take action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the

default specified in the waiver, and then said waiver shall be operative only for the time and to the extent therein stated. Waiver of any term, covenant or condition contained herein by either party shall not be construed as a waiver of any subsequent breach of the same term, covenant or condition. The consent or approval by either party to or of any act by either party requiring further consent or approval shall not be deemed to waive or render unnecessary their consent or approval to or of any subsequent similar acts."

Plaintiffs filed a complaint for declaratory relief, asserting that a dispute had arisen over Bel Air's placement of storage containers in the common area behind the market. Plaintiffs asserted that Bel Air had essentially usurped parking spaces to expand its storage capacity. They sought a declaration that Bel Air had "no contractual right to place storage containers in the common areas."

At trial, plaintiffs presented evidence that Bel Air had utilized parking spaces for large containers to store seasonal merchandise. These containers remained in their location for several months each year. Other parking spaces were utilized for food racks, pallets, broken carts, a large oil storage bin, and other items.

Bel Air introduced evidence of practices at other stores to bolster its claim that the use of storage containers was standard practice at quality shopping centers. They also introduced evidence that plaintiffs had approved the use of parking spaces at the center for other purposes, such as a fireworks stand. Bel Air argued that the use of parking spaces for food racks and other items was part of the loading and unloading of merchandise and therefore permissible under the lease.

Plaintiffs challenged the relevance of the evidence of practices at other shopping centers, emphasizing that under its lease, Bel Air was limited to the nonexclusive use of common areas, including the parking area. By keeping materials in these parking spaces, Bel Air prevented others from using them, and was in violation of the lease.

In its statement of decision, the trial court found that the large seasonal storage containers "are used to store merchandise temporarily in addition to loading activities. The units are large and immovable and their placement results in exclusive occupation of the area of placement for extended periods. The practical effect of using the containers is to expand the space of the leased premises and occupy that space on an exclusive basis for significant periods of time. Use of the storage units is not authorized by the lease provision for loading and unloading."

The court rejected Bel Air's claim that such units were customary in other quality shopping centers, finding Bel Air's evidence on this point to be "lacking in foundation" and "unconvincing"; it found plaintiffs' witnesses "more persuasive." It also rejected Bel Air's related claims, such as waiver and breach of the covenant of good faith and fair dealing.

However, the court reached a different conclusion as to the other materials kept in the parking spaces. The court ruled: "The evidence showed that since the inception of the lease, Bel Air has used the area in question for the delivery of bread, milk and ice cream. This includes vendors temporarily leaving and rotating racks, containers and carts for the delivery and exchange of the subject products. These uses have been carried on without objection until this litigation was commenced. This is convincing evidence of the parties' understanding of the lease provisions."

The court found persuasive Bel Air's view that "these activities are authorized by the lease which permits the use of common areas for loading and unloading." It ruled that section 9.2(d)'s references to parking spaces for the use of parking must be "considered in light of the other provisions and not in isolation. The parking area is included in the common area. The provision in question is a covenant made by the landlord for the benefit of the tenant. It does not exclude other uses permitted in the common areas."

The court continued: "Furthermore, the evidence established that the use of the racks, carts and related containers is essential to the effective operations of the leased premises. Even if there was not an express provision for loading and unloading, the court would find that this form of use is implied."

The statement of decision concluded: "The court grants plaintiffs' request for a declaration that the lease grants [Bel Air] no right to place large seasonal storage containers in the defined common areas. The request of relief beyond that described is denied." The ensuing judgment incorporated this particular language verbatim, and noted that the judgment was "in accordance with the Court's statement of decision."

Plaintiffs appeal.

DISCUSSION

■ " ' "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' [Citation.] [¶] ' "A [contract] provision will be considered ambiguous

when it is capable of two or more constructions, both of which are reasonable." [Citations.] The fact that a term is not defined in the [contract] does not make it ambiguous. [Citations.] Nor does "[d]isagreement concerning the meaning of a phrase," or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " [Citation.] " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " [Citation.]' " (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390–391 [33 Cal.Rptr.3d 562, 118 P.3d 589].)

# I

## *Refrigerated Trailers*

At trial, the parties took pains to distinguish storage "containers" from storage "trailers." Containers are immobile and placed on level ground. Trailers, in contrast, are wheeled, driven down a ramp, and parked in the loading bay so that their contents can be delivered directly into the store. Bel Air placed large seasonal storage containers in the parking area, and used refrigerated trailers in the loading bay at holiday times for frozen and refrigerated goods, such as turkeys. In its statement of decision, the court described the use of containers and trailers, and concluded that the use of storage containers in the parking area was not permitted under the lease. The court also stated that the use of refrigerated trailers "is not in dispute."

Plaintiffs challenge that conclusion, asserting that Bel Air's use of refrigerated trailers was indeed a matter to be resolved. We disagree.

Plaintiffs are correct in noting that their complaint mentioned both trailers and containers. However, the focus of their complaint and their arguments was on the use of parking spaces, not on the use of trailers in loading docks.

The complaint alleged that "[t]he disputed issues pertain to [Bel Air's] alleged right to place storage containers and storage trailers in the common area located behind the Bel Air Market." The complaint continued: "From time to time, storage containers or storage trailers are placed *in parking stalls* in the common parking area and are left in the common area for weeks or months at a time. Other *storage containers* are parked in two of the three delivery spaces intended solely for use by trucks delivering merchandise to BEL AIR." (Italics added.)

While this last sentence might arguably refer to the use of trailers in the loading dock (despite the reference to "containers" rather than "trailers"), plaintiffs never made such an assertion as litigation proceeded. In their trial

brief, plaintiffs expressly stated: "Specifically, Plaintiffs contest BEL AIR's unilateral usurpation of certain designated parking areas within common areas of the Center for its exclusive use. In particular, Plaintiffs object to BEL AIR's use of designated parking areas for trash disposal, rack storage and the placement of large storage containers. Specifically, BEL AIR claims a right to use these areas in violation of the provisions of the lease and Sacramento's City Parking Ordinance." It noted that after discussions that resulted in the removal of storage containers in January 2003, "BEL AIR continued its improper use of the parking areas in the area behind the Center. In this regard, periodically BEL AIR would place large storage containers which were left in place for months at a time. Additionally, BEL AIR consistently and continually uses parking areas behind the Center for the placement of storage of milk racks, ice cream racks, and bread racks. Despite repeated requests by the property manager that BEL AIR cease and desist its exclusive use of the parking areas behind the Center, BEL AIR refuses to do so." No mention was made of refrigerated trailers parked in the loading dock.

In plaintiffs' opening argument, counsel asserted that Bel Air had expanded its storage area by placing storage containers "right in the parking areas," and had "utilized the parking areas for the conducting of their business," rather than for permissible periodic loading and unloading. He emphasized that the common areas are nonexclusive, and that Bel Air had no right to "spill their business over into parking areas." At no time did counsel argue that Bel Air's use of refrigerated trailers in the loading dock was also impermissible.

In their briefs after trial, plaintiffs reviewed the evidence demonstrating Bel Air's use of parking spaces for storage containers, food racks, broken carts, and an oil recycling bin. They stated that the "evidence clearly reflects that BEL AIR has misappropriated portions of the parking areas located in the common areas directly behind the BEL AIR store for its exclusive use." Again, no mention was made of the refrigerated trailers parked in the loading dock during holidays.

Plaintiffs were concerned with Bel Air's conversion of parking spaces into storage spaces, not Bel Air's use of refrigerated trailers in the loading bay. Even.if plaintiffs' complaint might be construed as including a reference to storage trailers, that issue was abandoned as trial progressed. The evidence supports the trial court's conclusion that the use of refrigerated trailers was not at issue. There was no error.

## II

### *Food Racks and Similar Items*

The trial court determined that Bel Air's use of parking spaces for food racks, pallets, an oil recycling bin, and broken shopping carts was permissible under lease provisions allowing the use of common areas for the loading and unloading of merchandise. Plaintiffs raise a number of challenges to this decision, including an assertion that there is insufficient evidence to support this finding. We agree.

We consider the evidence in the light most favorable to the court's factual determinations, giving Bel Air the benefit of every reasonable inference and resolving conflicts in support of the court's judgment. (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 10 [14 Cal.Rptr.3d 89]; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925].)

The words of a contract are to be understood in their ordinary sense. (Civ. Code, § 1644.)

There is no question that the racks, bins, and carts were used for loading and unloading at some point during the process of delivering items to the store or picking items up for repair or recycling. That usage was proper under the lease provisions and essential to the operation of the supermarket. However, the evidence is equally clear that these items were left in the parking spaces far beyond any time associated with the actual loading and unloading of merchandise.

Rolling carts were left in the parking spaces to await the next delivery. All of the witnesses, for both plaintiffs and Bel Air, agreed that carts were always in the parking spaces. The same carts were not there (they rotated in and out as new deliveries were made), but carts were always present. The store director for Bel Air testified that empty bread, milk and ice cream racks had "always been stored" in the parking spaces and that these items were always in the parking area. He asserted this system was necessary to maximize operational efficiency. In correspondence with plaintiffs, Bel Air's attorney claimed that Bel Air "has always had use of the [Common] Area, not only for container storage but for *storage of items such as bread racks, milk boxes, and pallets.*" (Italics added.) At trial she explained that the store "needed [the area] for our operations to store bread racks and the milk boxes and the pallets . . . ."

The oil recycling bin was a permanent fixture in the parking area. A company came by on a monthly basis to collect the oil for recycling, but the bin stayed.

Broken shopping carts were left in the parking area and a repair company came by every other month to fix them. Depending on when during the cycle a cart broke, it could remain in a parking space for 60 days. Old display racks were left in the parking spaces "[w]aiting to be hauled away."

None of these uses involves the "loading and unloading of merchandise" as contemplated by the lease. These items were not placed in parking spaces a reasonable time before they were picked up; the parking spaces were permanently used for the storage of these items. By keeping items in these spaces, Bel Air appropriated these parking spaces to the exclusion of anyone else. The fact that few cars parked in this part of the shopping center is irrelevant (particularly given that Bel Air's use of this area made this a less than desirable place to park). Under the lease, Bel Air had the right to nonexclusive use of these parking areas; it had no authority to commandeer these spaces for its own storage purposes.

There is insufficient evidence to support the trial court's determination that Bel Air's use of these spaces was permissible as part of the loading and unloading of merchandise.

We also agree with plaintiffs that there is insufficient evidence to support the court's statement that this use had occurred "since the inception of the lease." The lease began in 1987, but no witnesses described the practices at that time. In fact, none of the witnesses had any knowledge of practices before 1999.

Bel Air raises several arguments to support the court's determination. It insists that its use of parking spaces was consistent with the operation of quality shopping centers and therefore permissible under the lease.

But under the terms of the lease, any use, whether or not consistent with practices at other quality shopping centers, was subject to the overarching qualification limiting Bel Air to the *nonexclusive* use of common areas. If Bel Air's use of parking spaces violates that provision, it is immaterial that other centers might permit racks to be stored in parking spaces. Under the circumstances, Bel Air's reliance on the practices of other centers is misplaced.

Bel Air also insists that its use of parking spaces was permissible under an implied easement theory. The trial court made no findings on this point, but such a theory is untenable.

■ "An easement will be implied when, at the time of conveyance of property, the following conditions exist: 1) the owner of property conveys or transfers a portion of that property to another; 2) the owner's prior existing use of the property was of a nature that the parties must have intended or believed that the use would continue; meaning that the existing use must either have been known to the grantor and the grantee, or have been so obviously and apparently permanent that the parties should have known of the use; and 3) the easement is reasonably necessary to the use and benefit of the quasi-dominant tenement." (*Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 141 [80 Cal.Rptr.2d 126]; see also Civ. Code, § 1104.) "An implied easement is 'based on the theory that whenever someone conveys property, he includes or intends to include in the conveyance whatever is necessary for its beneficial use and enjoyment and to retain whatever is necessary for the use and enjoyment of the land retained.' [Citation.]" (*Larsson v. Grabach* (2004) 121 Cal.App.4th 1147, 1152 [18 Cal.Rptr.3d 136].)

Here, there was no preexisting use to give rise to any implied easement. The first lease in this case was between plaintiffs' predecessor and Bel Air. There was no preexisting use of any common space; the shopping center had yet to be built. Bel Air was the first tenant and, under the lease, had input on the design of the parking and loading areas of the shopping center. It remained a tenant, and did not transfer its rights to anyone. The only transfer that occurred in this case was from the original owner of the shopping center to plaintiffs. Implied easements are inapplicable under these circumstances.

■ More importantly, it is well settled that an implied easement cannot be used to grant rights that are otherwise precluded by the express language of the lease. (See, e.g., *Owsley v. Hamner* (1951) 36 Cal.2d 710, 717 [227 P.2d 263].) Easements cannot be implied if the express provisions of the lease exclude them. (*Dubin v. Robert Newhall Chesebrough Trust* (2002) 96 Cal.App.4th 465, 473 [116 Cal.Rptr.2d 872].) Here, the lease explicitly limited Bel Air to the nonexclusive use of the common areas. An implied easement cannot grant anything more.

The judgment must be reversed in part. Given this conclusion, we have no occasion to address plaintiffs' claim that Sacramento city ordinances preclude the use of parking spaces for anything other than parking. We therefore deny plaintiffs' request for judicial notice of these ordinances.

## Disposition

To the extent the judgment provides that Bel Air violated its lease by placing large seasonal storage containers in the shopping center's parking spaces, the judgment is affirmed. To the extent the judgment provides that Bel Air did not violate its lease by keeping bread racks, bins, carts, milk boxes, an oil recycling bin, and similar items in parking stalls, the judgment is reversed. Plaintiffs are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

Sims, Acting P. J., and Raye, J., concurred.