Filed 9/11/25  ABP Parcel 8 v. Marina Pacifica CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| ABP PARCEL 8, LLC, | B339122 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. 23STCP03931 |
| v. |  |
| MARINA PACIFICA, LLC, |  |
| Defendant and Appellant. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel M. Crowley, Judge. Affirmed.

Greenberg Traurig and Scott D. Bertzyk for Defendant and Appellant.

Russ, August & Kabat, Jules L. Kabat, Nathan D. Meyer and Erica S. Kim for Plaintiff and Respondent.

_____

The parties to this appeal arbitrated a dispute over the meaning of a provision appearing in two related real property leases. Plaintiff and respondent ABP Parcel 8, LLC (ABP) prevailed and filed a petition in the superior court to confirm the award. Defendant and appellant Marina Pacifica, LLC (Marina) filed a cross-petition to vacate the award. The court granted the motion to confirm, denied the motion to vacate, awarded ABP fees and costs relating to the judicial proceeding, and entered judgment accordingly.

Marina appeals, contending the superior court should have vacated the arbitration award on four statutory grounds: (1) that the arbitrator refused to hear material evidence to Marina's substantial prejudice (Code Civ. Proc.,[1] § 1286.2, subd. (a)(5)); (2) the arbitrator exceeded her powers (§ 1286.2, subd. (a)(4)); (3) ABP procured the arbitration award by fraud (§ 1286.2, subd. (a)(1)); and (4) the arbitrator's bias against Marina amounted to misconduct that substantially prejudiced Marina (§ 1286.2, subd. (a)(3)).

For the reasons set forth herein, we are unpersuaded by Marina's arguments and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

ABP, as lessor, and Marina, as lessee, are parties to two leases pertaining to an assemblage of real property located in Long Beach. They are not the original parties. Their respective predecessors in interest entered into these leases in the 1970's when the land was substantially undeveloped. As part of the leases, Marina's predecessor agreed to develop a shopping center on the assemblage and ABP's predecessor agreed to a rent structure that would provide it a percentage of the rental revenue from retail tenants. The original lessee, together with a joint

---

[1]    Undesignated statutory references are to the Code of Civil Procedure.

2

venture partner, Ernest W. Hahn, Inc. (Hahn, Inc.) built the Marina Pacifica Shopping Center and began subleasing space to tenants. Though it has weathered periods of distress, the development is, at present, very valuable.

The dispute submitted to the arbitrator concerns the original parties' intent regarding the duration of the lessee's rights under the leases. According to ABP, the leases terminate in 2039 and Marina's only right after termination is a *right of first refusal* to enter into a new lease on terms ABP may choose to negotiate with a third party that begins in the year following termination, if any. According to Marina, it has a full year after the leases terminate to *unilaterally renew* them on the same terms as the original leases.

Though the merits of the arbitrator's award are not (and cannot be) at issue, we provide an overview of the circumstances surrounding the leases and their relevant terms here for context, adding pertinent detail to our analysis below as necessary.

## I. The Leases and Development of the Shopping Center

The first lease was executed in October 1972 between San Gabriel River Improvement Co. (SGRI), as lessor, and Marina Pacifica, a limited partnership (MPLP), as lessee.

The term of the lease is 65 years, beginning on the "commencement date," defined, in relevant part, as the first date upon which each of four specified conditions was satisfied. Among these conditions was the execution of an agreement—what Marina calls the Boundary Agreement—between SGRI and various governmental entities to terminate California's easement rights arising from "tidelands" falling within the then-existing property bounds.[2] If any condition was unsatisfied by January 1,

---

[2]     The property's status as tidelands would have been a significant consideration for the parties in negotiating the lease

1974, the lessee had a two-month window in which to terminate the lease. The lessee did not exercise that right. The Boundary Agreement was fully executed on March 18, 1974, rendering the leased property unencumbered by any tidelands, and the lease commenced the following day, March 19, 1974.

About six weeks later, MPLP entered into a joint venture between itself and Hahn, Inc., called Marina Pacifica 1-C. Hahn, Inc., was the partner primarily responsible for developing, financing, leasing, and managing the shopping center. Construction on the shopping center was underway by no later than September 1975.

Although the original parties to the 1972 lease amended it after being freed from the 66-year limitation imposed by Civil Code section 718, they did not revise its duration. Indeed, they reaffirmed it. In February 1976, they entered into an amendment to the 1972 lease to exclude a 1.5-acre parcel from its ambit and executed a separate lease for that parcel. The term of the 1976 lease matched that of the 1972 lease then underway: "sixty-five (65) years, computed from March 19, 1974 and terminating at 12:01 A.M., Pacific Coast Time, on March 19, 2039."

## II. Paragraph 25 of the Leases

The 1972 and 1976 leases each contain the same paragraph 25, which was the subject of the underlying arbitration. That paragraph provides: "Lessor agrees that within a period of one (1) year commencing on the termination of the full term hereof, or any holding over, extension or renewal hereof, it will not lease or rent the premises or any portion thereof to any

---

because of Civil Code section 718. Whereas section 718 generally limits real property leases to 99 years, it limits leases of tidelands to 66 years. The parties' agreement to a 65-year term at the time when the property remained subject to tideland easements fell within the limitation.

4

person other than Lessee until Lessor has first offered so to lease or rent the premises or portion thereof to Lessee on the same terms and conditions and Lessee has rejected said offer. Said offer shall be made in writing, and Lessee shall have sixty (60) days from the receipt of it within which to accept or reject it." The caption of paragraph 25 is "Right of First Renewal." (Underscoring omitted.) However, paragraph 28A of the leases states "captions of the paragraphs and articles of this Lease are for convenience only and shall not be considered or referred to in resolving questions of interpretation or construction."

III.  **Transfers of the Original Parties' Rights Under the Leases**

Between July 6, 1976 and 1981, the lessee interests were assigned multiple times to entities not relevant here.

In 1981, ABP's parent entity, Alamitos Bay Partnership, LLC (ABP Parent), bought the lessor interests from SGRI. ABP Parent is owned by a number of other entities, including Watt Companies, LLC (Watt Cos.). ABP Parent later conveyed the lessor interests to its wholly owned subsidiary, ABP. For simplicity, we disregard the distinction between ABP and ABP Parent.

In or about 1989, Bank of America foreclosed on the lessee interests.

Marina purchased the lessee interests from Bank of America in 1995.

IV.   **Diverging Views on Paragraph 25 Rights**

ABP and Marina first addressed the paragraph 25 rights at the heart of this dispute in connection with Marina's acquisition of the lessee's interest from Bank of America. An affiliate of Marina received an estoppel certificate from ABP in December 1993 relating to the 1976 lease which provided the lease "does not grant Tenant any options to extend the term of the Ground Lease beyond [March 19, 2039]."

5

Marina decided to go forward with the purchase of the lease interest and sought financing. In connection with that financing, Marina's lender required another estoppel certificate. We are directed to no executed version of that estoppel certificate in the record, but a markup by counsel for ABP Parent shows it was based on the 1993 pre-purchase estoppel certificate and proposed adding to the existing language the words italicized here: "The Ground Lease does not grant Tenant any options to extend the term of the Ground Lease beyond [March 19, 2039] *except those, if any, that are explicitly set forth in the Ground Lease*."

The initial financing was short-term only. As a result, Marina again sought financing in 1997. The estoppel certificates ABP issued to the new lender include the language ABP's counsel proposed in connection with the prior financing. They stated: "The Ground Lease does not grant Tenant any options to extend the term of the Ground Lease beyond [March 19, 2039] except those, if any, that are explicitly set forth in the Ground Lease." ABP issued the same estoppel certificates to the same lender through 2007. Marina asserts in its opening brief that this language "equat[ed] Paragraph 25 to an 'option to extend the Leases.' " We fail to see how.

In any event, ABP made its position clear in 2012 that paragraph 25 contained not an "option to extend" but a "right of first refusal." As part of broader discussions between the parties, Allison Lynch, an employee of Watt Cos. but acting on behalf of ABP, sent an e-mail to a Marina representative in January 2012 that included the following statement: "[I]n our review we have noted that [paragraph] 25 of the Ground Lease . . . provides the tenant with a right of first refusal [(ROFR)] at the end of the term. Specifically, until one year following the expiration of the term, the tenant has a ROFR on any lease for any part of the property. Our request would be to provide for an elimination of

the provision at this time and are having an agreement reflecting [*sic*] that change." The Marina representative did not dispute Lynch's characterization of paragraph 25.

However, in 2014, a difference of opinion emerged. To illustrate this, Marina directs us to an e-mail from Gregory Gill, another individual acting on behalf of ABP, to a Marina representative. Gill indicated Manny Simchowitz, a partner in Marina, raised the possibility of "some question of interpretation of the termination date of the ground lease." Gill continued, "[m]y partners want to understand if there is any legitimate question as to the ending date of the ground lease and get it sorted out now." The Marina representative relayed that Simchowitz's perspective was based on paragraph 25. The issue was not "sorted out" then.

In 2020, struggling in the face of COVID-19 restrictions, Marina sought a forbearance agreement from its lender. As part of that process, the lender requested updated estoppel certificates based on those issued in connection with the original financing. In response, ABP offered a certificate that reverted to the language contained in the certificate it provided Marina's affiliate before its acquisition of the lessee interests, i.e., "[t]he Ground Lease does not grant Tenant any options to extend the term of the Ground Lease beyond its scheduled expiration date." The lender proceeded without new certificates.

Shortly thereafter, Marina requested new estoppel certificates to support another refinancing. In recognition of disputes between the parties, ABP proposed to provide only the bare estoppel required of the lessor under the terms of the leases, as well as the statement that "[t]he term of the Ground Leases expires on March 18, 2039."

## V.       Judicial Suit and Settlement

In August 2021 Marina sued ABP and Gill in the superior court. Among other things, it alleged ABP's refusal to sign

7

estoppel certificates in the historical form Marina preferred was wrongful and jeopardizing its refinancing efforts.

Marina sought specific performance directing ABP to execute estoppel certificates in its preferred historical form, including the sentence "[t]he Ground Lease does not grant Tenant any options to extend the term of the Ground Lease beyond its scheduled expiration date except those, if any that are explicitly set forth in the Ground Lease."

The litigation quickly settled. By agreement dated August 30, 2021, ABP committed to give a form of estoppel certificate attached to the agreement.[3] The parties further agreed to arbitrate their dispute about paragraph 25. The agreement provides: "**Paragraph 25 Arbitration.** All disputes in any way regarding, relating to and/or arising from paragraph 25 of the Ground Leases shall be resolved by final and binding arbitration at JAMS pursuant to JAMS' comprehensive rules[4]; provided that time is allowed for reasonable discovery prior to the initiation of the arbitration hearing. . . . [B]y a prompt arbitration to be initiated by the Ground Lessor not later than November 1, 2021, Ground Lessor shall state there is a dispute between the parties regarding the scope of any rights and limitations set forth in paragraph 25 of the Ground Leases, and Ground Lessee's response to the demand for arbitration shall concur that there is such dispute; in turn, the arbitrator shall set forth a schedule for

---

[3] The settlement purports to attach the form but Marina directs us to a settlement in the appellate record which omits the attachments. According to Marina, the certificate was in the form it demanded in its complaint. However, the citation it provides for this assertion does not provide support for that statement.

[4] This refers to the JAMS Comprehensive Arbitration Rules and Procedures, made effective June 1, 2021 (JAMS rules).

8

Ground Lessor and Ground Lessee to simultaneously file and serve in the arbitration their respective positions of the scope of any rights and limitation [*sic*] set forth in paragraph 25 of the Ground Leases. . . . The arbitration shall be a 'baseball arbitration,' with the arbitrator limited to choosing one of the two positions (and with this 'baseball arbitration' limitation on the arbitrator's authority superseding any contrary provision in the comprehensive rules) . . . . Paragraph 23 of the Ground Leases [concerning entitlement to attorney fees and costs] shall apply to this arbitration to the same extent to which it would apply in a lawsuit filed in superior court."

ABP submitted a demand for arbitration pursuant to the settlement agreement and Marina timely filed its response. JAMS assigned the Honorable Elizabeth White (Ret.) to serve as the arbitrator in January 2022 and she held a preliminary hearing in March 2022. The parties thereafter engaged in discovery and sought the arbitrator's intervention on certain issues as they arose. The hearing went forward in May 2023 and lasted seven days. The arbitrator entered an interim award in favor of ABP in August 2023 and invited ABP to submit a motion for attorney fees and costs as allowed under paragraph 23 of the ground leases and incorporated by reference into the settlement agreement. Following briefing and a hearing on ABP's fee and cost request, the arbitrator issued her final award on October 10, 2023. It included $2,829,433.78 for ABP's fees and costs.

On October 27, 2023, ABP filed in the superior court a petition to confirm the arbitration award; Marina filed a cross-petition to vacate. After extensive briefing and a hearing, the court granted ABP's petition and denied Marina's cross-petition. Upon ABP's further request, the court granted ABP $242,194 in attorney fees and costs incurred on account of the confirmation proceeding, postjudgment interest on the arbitrator's fee and cost award, and entered judgment.

9

Marina timely appealed.

## DISCUSSION

### I.    Standard of Review

We review de novo a superior court's judgment confirming an arbitration award. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376, fn. 9 (*Advanced Micro Devices*).)

### II.    Analysis

"To uphold public policy favoring the use of arbitration as a relatively quick and inexpensive form of dispute resolution, and to vindicate the parties' intention of obtaining a final award, judicial review of arbitration awards is limited. [Citations.] The permissible grounds of judicial review are found in . . . sections 1286.2 (vacating awards) and 1286.6 (correcting awards)." (*Sy First Family Ltd. Partnership v. Cheung* (1999) 70 Cal.App.4th 1334, 1345.) Only the vacatur grounds are relevant here.

Because an arbitration award is not reviewable on the merits, the grounds for vacatur set forth in section 1286.2 are necessarily limited and given a correspondingly narrow construction by courts. Our Supreme Court has described them as protecting only "against error that is so egregious as to constitute misconduct or so profound as to render the process unfair. The Legislature has authorized 'judicial review in circumstances involving *serious problems* with the award itself, or with the fairness of the arbitration process.' [Citation.] ' "The statutory provisions for [review of an arbitration award] are manifestly for the sole purpose of preventing the misuse of the proceeding, where corruption, fraud, misconduct, gross error, or mistake has been carried into the award to the substantial prejudice of a party to the proceeding." ' " (*Heimlich v. Shivji* (2019) 7 Cal.5th 350, 368, fn. omitted, first bracket added (*Heimlich*).)

10

It is a feature, not a flaw, that many errors and defects in the arbitral process are unreviewable. " 'Submission of disputes to arbitration always risks an accumulation of procedural and evidentiary shortcuts that would proper[l]y frustrate counsel in a formal trial. But because "the advantages of arbitration are speed and informality, an arbitrator should be expected to act affirmatively to simplify and expedite the proceedings before him." [Citation.] Thus, whatever indignation a reviewing court may experience in examining the record, it must resist the temptation to condemn imperfect proceedings without a sound statutory basis for doing so.' " (*Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 835 (*Pour Le Bebe*).)

### A. The Arbitrator Did Not Exceed Her Powers Within the Meaning of Section 1286.2, Subdivision (a)(4)

Section 1286.2 requires vacatur of an arbitration award when "arbitrators [have] exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (§ 1286.2, subd. (a)(4).) "The powers of an arbitrator derive from, and are limited by, the agreement to arbitrate." (*Advanced Micro Devices*, *supra*, 9 Cal.4th at p. 375.) Relevant limitations include any " 'specific restrictions in the arbitration agreement, the submission [to arbitration] or the rules of arbitration.' " (*Cooper v. Lavely & Singer Prof. Corp.* (2014) 230 Cal.App.4th 1, 17, italics omitted.)

Marina contends the arbitrator exceeded her powers in three ways: by her (1) misapplication of "baseball arbitration" rules; (2) exclusion of material evidence based on evidentiary rules; and (3) denial of some of Marina's requests for discovery. The first two ways purportedly violated JAMS rules. The third way purportedly violated Marina's right to "reasonable discovery" established in the parties' settlement agreement.

11

### 1. The Purported JAMS Rules Violations Do Not Furnish a Basis for Vacatur

The arbitrator complied with JAMS rules as she interpreted them. Her interpretation is final.

In *Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1451 (*Greenspan*), the court held that an arbitrator's interpretation of applicable arbitral rules "may be judicially reviewed on the merits where the parties have explicitly and unambiguously agreed that the arbitration award is subject to that scope of review." The parties in *Greenspan* had made no such agreement. Rather, as the parties did here, they agreed to be governed by JAMS rules, including JAMS rule 11(a). (*Greenspan*, *supra*, at p. 1442.) That rule provides for the arbitrator to "resolve disputes about the interpretation and applicability of the[] [JAMS] Rules and conduct of the Arbitration hearing. The resolution of the issue by the Arbitrator shall be final." (JAMS rule 11(a); *Greenspan*, *supra*, at p. 1440.) This provision renders the arbitrator's interpretation and application of the rules final. (*Greenspan*, *supra*, at p. 1455.)

Here, the arbitrator interpreted the JAMS rules to allow her to conduct a baseball arbitration in the manner that she did and to exclude material evidence based on generally applicable rules of evidence. Marina characterizes the arbitrator's conduct as a deliberate flouting of the rules. For the reasons that follow, we disagree.

### a. Baseball Arbitration

The parties' agreement to use JAMS "baseball arbitration" to resolve their dispute about contract interpretation involving no money damages was a curious one. JAMS baseball arbitration is governed by JAMS rule 33 and is predicated on there being a dispute over money damages: "the Parties shall exchange and provide to JAMS written proposals for *the amount of money damages* they would offer or demand." (JAMS rule 33(a), italics

added.) This is consistent with explanations of baseball arbitration found in published California decisional law. (See, e.g., *Bowers v. Raymond J. Lucia Companies, Inc.* (2012) 206 Cal.App.4th 724, 734 ["Baseball-style arbitration [entails] an arbitrator decid[ing] a *monetary dispute* by selecting from the parties' final proposals . . . ." (Italics added.)].)

Indeed, before the trial court, Marina's counsel conceded the JAMS baseball arbitration rules "deal with damages," such that the parties "were fitting [a] round peg in a square hole" by selecting them to resolve their dispute. The incongruity between the nature of the dispute and the rules framework the parties chose required the arbitrator to determine the extent to and manner in which the baseball arbitration rules would apply. Again, these determinations are nonreviewable. (JAMS rule 11(a); *Greenspan*, *supra*, 185 Cal.App.4th at p. 1440.) However, we describe them for completeness and to demonstrate that the arbitrator made a considered interpretation rather than deliberately violating the rules as Marina claims.

### i.     Position Statements

In accordance with their settlement agreement and by analogy to JAMS rule 33(a), the arbitrator required the parties to submit their respective positions on the meaning of paragraph 25 only. She insisted they offer just one position and rejected Marina's attempt to submit alternative arguments, including what Marina calls a "compromise position" based on a hypothetical application of Civil Code section 718. The arbitrator's approach followed from the parties' agreement to "file and serve in the arbitration their respective positions o[n] the scope of any rights and limitation[s] set forth in paragraph 25 . . . ." She had sole authority to interpret the scope and meaning of the arbitration agreement. (JAMS rule 11(a); *Greenspan*, *supra*, 185 Cal.App.4th at pp. 1446–1447 [under JAMS rule 11, "the arbitrator decides arbitrability issues at the outset, and his

13

decision is final"]; see also *Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert* (2011) 194 Cal.App.4th 519, 529 [" ' " ' "Under the [principle] of broad construction an arbitrator is authorized to determine all questions which he needs to determine in order to resolve the controversy submitted to him, and the arbitrator himself decides which questions need to be determined." ' " ' "].)

### ii. Written Statement of Reasons

Notwithstanding JAMS rule 33(b), the arbitrator also explained her award in a written statement of reasons. Rule 33(b) provides that a baseball arbitration award shall be one of the party's proposed amounts of money damages, unaccompanied by a written statement of reasons. This is an exception to the general prescription of rule 24(h) that "the Award shall . . . contain a concise written statement of the reasons for the award." The arbitrator invited argument on whether the rule 33(b) exception applied under the circumstances. ABP thought not. Its counsel argued a statement of reasons was justified because it was "not a simple baseball arbitration" limited to choosing a damages number. Marina, on the other hand, contended the parties' choice of baseball arbitration made rule 33(b) applicable such that a statement of decision was not permitted. The arbitrator agreed with ABP, explaining "the complexity of the parties' positions, the affirmative defenses asserted, and the importance of the factual findings and legal support for the Arbitrator's Award" warranted issuing a statement of reasons.[5]

---

[5] Marina notes that the arbitrator, when explaining *in her written statement of reasons* why she thought *a written statement of reasons under rule 24(h) was appropriate*, said "Rule 33"—which contains the written statement exemption—"should be followed." The arbitrator plainly intended to say "Rule 24(h) should be followed." We therefore read her reference to rule 33 as being to rule 24(h). (See *Gen. Waiters v. Lee* (2d Cir. 2017)

14

### iii.   Expression of Winning Position

Finally, Marina contends the arbitrator violated baseball arbitration's fundamental premise by choosing neither Marina's nor ABP's position but "making her own findings as to what Paragraph 25 meant." This contention has no merit. It is premised on Marina's view that the arbitrator was bound to "choose between two competing baseball positions without altering a word." This is found nowhere in the JAMS baseball arbitration rules because JAMS baseball rules concern positions expressed only in numbers. The settlement agreement only required the arbitrator to "choos[e] one of the two positions." In substance, this is what she did. (See *Mave Enters. v. Travelers Indem. Co.* (2013) 219 Cal.App.4th 1408, 1424 ["argument exalt[ing] form over substance . . . is disfavored"], citing Civ. Code, § 3528.) The arbitrator's explication of paragraph 25 begins by rejecting Marina's position and continues by adopting the substance of ABP's position with, as far as we can tell, only stylistic changes. Certainly, Marina identifies no substantive differences. Only on reply does Marina tease a distinction in a footnote to its claim that the arbitrator's award "wasn't" ABP's position. There it says "ABP's baseball position statement . . .

---

857 F.3d 466, 479, fn. 22 [declining to read literally a typographical error that was obviously contrary to intent established by context].) ABP offers the alternative explanation that the arbitrator *did* mean "Rule 33 should be followed" but was referring to rule 33(d) as overriding rule 33(b)'s exception to rule 24(h)'s written statement requirement where money damages are not at issue. Rule 33(d), which the arbitrator only appears to have adopted in a separate order (albeit in an analogous situation), says "[o]ther than as provided herein, the provisions of Rule 24 shall be applicable." In either event, the arbitrator's explanation and conduct unequivocally show she interpreted the JAMS rules as allowing her to issue a written statement.

conspicuously avoids using the term right of first refusal . . . ." While the natural implication of Marina's footnote is that the arbitrator's award *did* use that term, this is not the case. The following operative language appears in both ABP's position and the final award: "if" ABP "wants to sign a lease with someone other than [Marina]" to begin "within . . . one-year . . . after the March 19, 2039, term end date," ABP must first "offer to [Marina] to accept or reject such a lease . . . ."

The arbitrator plainly interpreted the JAMS rules and the parties' agreement as permitting her to express ABP's position in her award as she did. (See *Starr v. Mayhew* (2022) 83 Cal.App.5th 842, 850 [" ' "[E]very reasonable intendment must be indulged in favor of the award." ' "].) That interpretation is final. (JAMS rule 11(a); *Greenspan*, *supra*, 185 Cal.App.4th at p. 1440.)

### b.    Rules of Evidence

Marina argues JAMS rule 22(d) prevented the arbitrator from excluding material evidence under evidentiary rules. The arbitrator repeatedly said the circumstances underlying the dispute compelled her to be particularly attuned to hearsay issues and that she interpreted the JAMS rules as allowing her to exclude evidence that would be inadmissible in court. Rule 22(d) is undoubtedly susceptible to this interpretation.

In relevant part, rule 22(d) provides that "[s]trict conformity to the rules of evidence is not required . . . . The Arbitrator shall consider evidence that he or she finds relevant and material to the dispute, giving such weight as is appropriate." (*Ibid*.) According to Marina, this means the arbitrator was prohibited to rely on traditional admissibility principles to exclude material evidence. Marina is wrong, and its own conduct shows it.

As an initial matter, that strict conformity is "not required" under rule 22(d) does not amount to a prohibition on resort to the

rules of evidence to control what is admitted. (Cf. *Cacho v. Boudreau* (2007) 40 Cal.4th 341, 354 [absence of requirement not equivalent to prohibition]; see also *Campaign for Accountability v. Consumer Credit Research Found.* (Ga. 2018) 815 S.E.2d 841, 844–845; see also *id.* at p. 845 ["[i]f a teacher tells his students that an extra credit assignment is not *required*, a student who completes the work would be quite annoyed if the teacher rejected it as *prohibited*"].) Moreover, even if "strict" conformity were prohibited by the rules, such prohibition would not extend to some lesser fidelity to evidentiary principles.

The arbitrator made clear from the outset that evidentiary rules *would* have currency. Her first scheduling order, issued more than a year before the hearing began, established the expectation of evidentiary objections. It directed the parties to prepare a joint exhibit list that "indicates any Party's objection to the introduction of any exhibit and the basis therefor."

Two weeks before the start of the hearing the arbitrator announced she would be specifically alert to hearsay issues. Because the case "[went] back to 1972 and [there would be] witnesses who wouldn't have been able to testify, were they still alive," she said she would "be kind of careful about hearsay." She disclosed that, even without an objection, she would be "internally careful about [it] in [her] head," and if she "fe[lt] that testimony is not credible, because it is hearsay upon hearsay upon hearsay, [she] would make that analysis regardless of whether an objection is made." In short, she informed the parties that she anticipated hearsay-based objections and would reject hearsay testimony if she felt it was insufficiently reliable.

On the first day of the hearing, the arbitrator reiterated that the case went "back to the '70[']s, and issues are going to arise with respect to hearsay . . . ." She went on to "reserve the right to rule [on a hearsay objection] in the context of the presentation." Going forward, the arbitrator repeatedly explained

17

her rulings excluding hearsay were driven by fairness: "We are dealing with [events in the] 1970's and most people are dead. . . . [I]t's not fair to bring in statements that can't be tested or cross-examined."

Marina relies heavily on *Harvey Aluminum v. United Steelworkers of America, AFL-CIO* (C.D.Cal. 1967) 263 F.Supp.488 to argue the arbitrator's exclusion of evidence on hearsay and other traditional grounds warrants vacatur. In that case, the arbitrator excluded testimony of a rebuttal witness on the grounds that he should have been offered as part of the petitioner's case-in-chief. (*Id.* at p. 493.) The federal district court held such exclusion denied the petitioner a fair hearing: "The refusal by the Arbitrator to hear all of the [rebuttal testimony] or to consider [such] testimony in making his Award turned on a rule of evidence which the court concludes should not have been binding on petitioner in the absence of *some warning by the Arbitrator as to the evidentiary rules to be followed*." (*Ibid.*, italics added.)

But, as set forth above, the arbitrator *did* offer "some warning" before the start of the hearing that traditional rules of evidence—and particularly hearsay—would have force. Marina's conduct demonstrates it understood this. By its own count, Marina made 169 evidentiary objections. Before the hearing began, Marina asserted objections to exhibits included on ABP's exhibit list, including on the grounds of hearsay and other specific provisions of the Evidence Code. Once the hearing began, Marina immediately objected to a witness whose testimony was offered by declaration—i.e., a hearsay declaration. The arbitrator ordered the witness be made available in person because Marina "obviously" was entitled the opportunity to cross-examine him. The arbitrator also sustained other hearsay objections interposed by Marina. Indeed, when the arbitrator explained JAMS rule 22 was for "[her] guidance in terms of fairness" and while

18

"arbitrators can consider lots of things [courts cannot]," "with 50 years [passed] and so many people no longer alive, it simply isn't fair to allow hearsay," Marina's counsel responded, "I agree with you."

### c. Discovery

The parties' settlement agreement provided they would have "time . . . for reasonable discovery prior to the initiation of the arbitration hearing." They did not further elaborate on what that meant.

Marina concedes it was allowed all discovery permitted by JAMS rule 17, as well as expert depositions and "third party subpoenas . . . agreed to [or allowed by the arbitrator]." However, it complains it was allowed "only those few subpoenas to which ABP did not object" and that the arbitrator declined to direct ABP to search for e-mails of Lynch and another individual.

Marina's complaints amount to a request that we review the arbitrator's discovery orders. The parties vested the arbitrator with control over discovery when they agreed JAMS rules would govern their arbitration. (See JAMS rule 17(d) [arbitrator to decide discovery disputes].) Our review would betray that bargain. (See *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10 (*Moncharsh*) ["[A]n arbitration decision is final and conclusive *because the parties have agreed that it be so*. By ensuring that an arbitrator's decision is final and binding, courts simply assure that the parties receive the benefit of their bargain."].)

Moreover, because an arbitrator's discovery order is not reviewable, such orders "should not provide a basis for vacating an award unless the error *substantially prejudiced* a party's ability to present *material* evidence in support of its case." (*Schlessinger v. Rosenfeld, Meyer & Susman* (1995) 40 Cal.App.4th 1096, 1110.) Marina makes a passing attempt at satisfying this standard, claiming lack of access to Lynch's e-

19

mails deprived Marina the right to a fair hearing because the award "relied on" Lynch's testimony.

We do not agree. The award mentioned Lynch's testimony by way of background but did not rely on it. The arbitrator's mode of decision made clear Lynch's testimony was immaterial to her analysis[6] when she concluded paragraph 25 was susceptible to "only [one] reasonable interpretation." Put another way, she found paragraph 25 unambiguous. (See *Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 575 [ambiguity arises only where contract is reasonably susceptible to more than one meaning].) Thus, she had no occasion to rely on Lynch's statements validating ABP's interpretation. (See *PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 156 (*PV Little Italy*) [where contract is unambiguous, "resort to extrinsic evidence of the parties' intent is unnecessary and even inappropriate"]; see also *Jameson v. Chanslor-Canfield Midway Oil Co.* (1917) 176 Cal. 1, 8 ["where the terms of the contract are clear and explicit, where the meaning is not doubtful and there is no latent ambiguity, it cannot be varied by the subsequent conduct of the parties or surrounding circumstances"].)

### d. Acts Argued to Have Exceeded the Arbitrator's Powers for the First Time on Reply

On reply, Marina argues the arbitrator exceeded her powers by referring to Civil Code section 718 in her award and by awarding ABP attorney fees and costs. Marina refers to its

---

[6] Cf. *Hall v. Superior Court* (1993) 18 Cal.App.4th 427, 439 ("To find substantial prejudice the court must accept, for purposes of analysis, the arbitrator's legal theory and conclude that the arbitrator might well have made a different award had the evidence been allowed.").

opening brief when arguing these points in its reply, but we find they were not adequately raised and are therefore forfeited.

As to the reference to Civil Code section 718, Marina made the bare assertion in the introduction to its opening brief that the arbitrator exceeded her power by "basing her decision on the very legal principle she had just stricken" from Marina's position statement. However, Marina did not revisit this assertion in its excess of power argument. At best, it cross-referenced a statement in its background section that, after "hold[ing] that Section 718 was outside the scope of the arbitration," "the Arbitrator later rested her decision on a (mis)application of that very statute." No cases were cited nor was any analysis provided beyond those conclusory sentences.

As to the fee and cost award, Marina asserted in its introduction that attorney fees and costs were "not even allowed by the arbitration agreement," but its excess of power discussion made no argument about them at all. At best, one of the pages of the opening brief cross-referenced in that discussion contained a footnote contending the lease provision permitted fees only in "actions over damages or breaches of contract" and the arbitration involved neither.

"We will not ordinarily consider issues raised for the first time in a reply brief. [Citation.] An issue is new if it does more than elaborate on issues raised in the opening brief or rebut arguments made by the respondent in respondent's brief. Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments about the new issue." (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275–276.)

The arbitrator's reference to Civil Code section 718 and award of attorney fees were not adequately raised as acts in

excess of the arbitrator's powers in Marina's opening brief. Marina's bare cross-reference to background facts does not satisfy its obligation to "supply the reviewing court with some cogent argument supported by legal analysis . . . ." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286–287.) And even if the footnote in the procedural background addressing legal fees amounted to legal argument, it would not preserve the point for our review. (See *People v. Crosswhite* (2002) 101 Cal.App.4th 494, 502, fn. 5 [deeming forfeited argument raised "only in a footnote under an argument heading which gives no notice of the contention"].)

Though unnecessary to our decision, we note these forfeited points lack merit. The arbitrator referenced Civil Code section 718 in her award to illustrate that Marina's position— that the ground leases afforded the lessee the right to at least 130 years of possession—was not reasonable. This is a different purpose than that for which Marina had tried to use it. Despite the settlement agreement providing the arbitration would address only the "rights and limitations set forth in paragraph 25 of the Ground Leases," Marina asked the arbitrator to first adopt its 130-year-plus position and then consider the issue *not* submitted of how that would fare in the face of section 718. The arbitrator only considered section 718 as a means of performing the task she understood the parties to have put before her: interpreting paragraph 25.[7]

---

[7] As noted, Civil Code section 718 provides that no real property lease may extend beyond 99 years. A lease in excess of that, or any lesser restricted term, is illegal by statute. (*Tufeld Corp. v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 28.) Under general rules of contract interpretation, "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into

Marina's attorney fee and cost argument is similarly misguided. First, Marina misrepresents the terms of the attorney fee clause in the ground leases. The clause is not limited to "actions over damages or breaches of contract." Rather, it also applies to actions "to enforce any provision [of the ground leases]." The Court of Appeal in *Harbour Landing-Dolfann v. Anderson* (1996) 48 Cal.App.4th 260, 263, held such a provision embraces actions for the interpretation of a lease provision: "[The appellant] argues attorney fees are only available in an action brought 'to enforce' a lease provision, but its declaratory relief action was brought 'seeking an *interpretation* of the [lease]' . . . . We reject [the appellant's] assertion."

### B. The Arbitrator Did Not Refuse to Hear Evidence Material to the Controversy Within the Meaning of Section 1286.2, Subdivision (a)(5)

Section 1286.2 requires vacatur of an arbitration award when "[t]he rights of the party were substantially prejudiced by . . . the refusal of the arbitrators to hear evidence material to the controversy . . . ." (§ 1286.2, subd. (a)(5).) Vacatur under this provision "must rest on more than a simple error in applying the rules of evidence." (*Heimlich, supra,* 7 Cal.5th at p. 368.) "Instead, [the provision] was designed as a 'safety valve in private arbitration that permits a court to intercede when an arbitrator has prevented a party from fairly presenting its case.' [Citation.] It comes into play, for example, when an arbitrator,

---

effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) "Pursuant to this rule, [a contract will not be construed] in a manner that will render it unlawful if it reasonably can be construed in a manner which will uphold its validity." (*People v. Parmar* (2001) 86 Cal.App.4th 781, 802.)

without justification, permits only one side to present evidence on a disputed material issue." (*Ibid.*)

We preliminarily note that much of the evidence Marina complains was excluded was, in fact, admitted. For example, Marina said it was prevented from showing the property was still in tidelands in 1972. But the arbitrator recited this fact in the award. Marina said it was prevented from showing contemporary treatises described the right of renewal as the preferred option to extend leases beyond the limitations imposed by Civil Code section 718; rights of renewal were the preferred option of the eponymous officer of Hahn, Inc.; and the law firm that prepared the leases followed one of these treatises as a matter of course. But the arbitrator received testimony largely to this effect from Craig Edgecumbe. Marina said it was prevented from showing the leases had multiple provisions it considered complementary and intended to effect a right of renewal. But the entire leases were in evidence.

Other evidence Marina says was refused was never proffered. For example, Marina contends, without record citation, it was prevented from showing "one of ABP's representatives admitted that Paragraph 25 *provided extension rights to the Lessee*." (Italics added.) Marina's reply brief reveals this purported exclusion refers to the arbitrator's refusal of hearsay testimony to relay a purported statement by a deceased principal of Watt Cos. According to Marina's offer of proof, the Watt Cos. principal "acknowledged [Marina] had *some rights*" under paragraph 25 (italics added) and said he would discuss with his partners—a noncontroversial statement that is a far cry from what Marina now claims it was. Indeed, upon hearing the offer of proof, the arbitrator commented "even assuming he said it, I don't know how relevant it is."

And some of the evidence Marina claims was wrongly refused was refused because the arbitrator found it immaterial—

24

a finding she was expressly allowed to make under JAMS rule 22(d). For example, Marina contends it was prevented from showing a third party appraiser recently interpreted paragraph 25 in the way Marina was advocating. But the arbitrator said "[the appraiser] made that determination, but it's not something that is . . . important for my determination."[8] The reason for this is obvious: it was for the arbitrator, not a third party appraiser, to determine whether Marina's interpretation was reasonable. (See *Indus. Indem. v. Superior Court* (1990) 224 Cal.App.3d 828, 831 ["Whether a contract is ambiguous is a question of law."]; see also *Muzzi v. Bel Air Mart* (2009) 171 Cal.App.4th 456, 463 [" '[d]isagreement concerning the meaning of a phrase' " does not make it ambiguous].)

Those issues aside, the fundamental point is this: the arbitrator did not arbitrarily refuse the evidence Marina contends she should have considered. She considered it and rejected it based on rules of evidence she determined were applicable. To the extent there was any error in the arbitrator's evidentiary rulings, it is not a ground for vacatur. (*Heimlich*, *supra*, 7 Cal.5th at p. 368.)

The arbitrator also excluded the testimony of Robert Rocchi, a former employee of the defunct Hahn, Inc., on the ground that Marina had been dilatory in identifying him. Marina announced its desire to call Rocchi on the fourth day of the arbitration and attempted to present him on the fifth day. The scheduling order did not allow this without leave of the arbitrator upon a showing of good cause. After hearing evidence that Rocchi's name was in discovery produced to Marina nine months

---

[8] The arbitrator similarly concluded a prospectus prepared by a third party containing an interpretation of paragraph 25 was irrelevant.

prior,[9] the arbitrator rejected his testimony.[10] As the parties agreed that the arbitrator would have the final say about the "conduct of the Arbitration Hearing," we cannot second-guess her orders applying or interpreting her own scheduling order. (JAMS rule 11(a); *Greenspan, supra*, 185 Cal.App.4th at p. 1440.)

This case bears no semblance to *Royal Alliance Associates, Inc. v. Liebhaber* (2016) 2 Cal.App.5th 1092, "the paradigmatic example of when a refusal to hear evidence will justify vacation of an award." (*Heimlich, supra*, 7 Cal.5th at p. 369.) "The *Royal Alliance* arbitration panel allowed a securities broker to 'speak, unsworn and at length,' but 'denied the former client the opportunity to cross-examine the broker or to speak herself' because the panel apparently 'felt itself too busy to allow each side the opportunity to present evidence.' [Citations.] The panel then issued a decision that 'relied on the former client's failure to dispute the broker's account or to offer evidence of financial losses.' [Citations.] In vacating the decision, the appellate court in *Royal Alliance* concluded the arbitration panel's refusal to hear from the former client 'was not fair.' " (*Plantations at Haywood 1,*

---

[9] Marina complains the arbitrator did not hear testimony from Ryan Stearns, the son of the named partner of the Barrett Stearns firm that counted Hahn, Inc., as a client, regarding Marina's diligence in finding Rocchi. It is impossible to assess the prejudice of excluding this testimony because Marina's own counsel admitted she was unable to give an offer of proof as to what Stearns would say. (Cf. *People v. Anderson* (2001) 25 Cal.4th 543, 580 ["the reviewing court must know the substance of the excluded evidence in order to assess prejudice"].)

[10] The arbitrator did so after carefully reviewing a declaration by Rocchi submitted as an offer of proof and concluding it was entirely unreliable hearsay, speculation and disguised expert testimony about what the defunct Hahn, Inc.'s deceased principal "would have" done or said in connection with Marina's predecessor in interest's negotiation of the ground leases.

26

*LLC v. Plantations at Haywood, LLC* (2025) 108 Cal.App.5th 803, 812.)

By contrast, here, the arbitrator made repeated, deliberate decisions that accepting untestable hearsay would not be fair to ABP or persuasive to her and concluded the scheduling order permitted her to exclude Rocchi's testimony proffered midway through the hearing. A review of the entire transcript reveals she did not refuse wholesale to hear any of Marina's evidence and indeed she frequently overruled ABP's objections to Marina's evidence as well. To second-guess her determinations would be to supplant the role of the arbitrator.

### C. The Record Does Not Show the Arbitration Award Was Procured by Fraud Within the Meaning of Section 1286.2, Subdivision (a)(1)

Section 1286.2 requires vacatur of an arbitration award when "[t]he award was procured by corruption, fraud or other undue means." (§ 1286.2, subd. (a)(1).) Fraud by the prevailing party during an arbitration may warrant vacatur under section 1286.2, subdivision (a)(1). (*Comerica Bank v. Howsam* (2012) 208 Cal.App.4th 790, 825.) The party seeking vacatur under this provision must show: (1) by clear and convincing evidence that the fraud occurred; (2) that it lacked an opportunity to discover and reveal the alleged fraud at the arbitration hearing; and (3) that the fraud had a substantial impact on the arbitrator's decision. (*Pour Le Bebe, supra,* 112 Cal.App.4th at pp. 830, 833, 837.)

Marina offers two theories of fraud. First, that ABP discussed in briefing, and the arbitrator mentioned in her award, two exhibits to which Marina had objected and, according to

27

Marina, the arbitrator said she would not consider.[11] These exhibits, identified in the arbitration as 201 and 206, contained correspondence between the original parties to the leases prior to the execution of the 1972 lease and the 1976 lease. In her award, the arbitrator referenced these exhibits to support her observation that "notes on drafts and letters from 1972 do not reflect any change to the 65-year term" in the 1972 lease. Setting aside conflict in the record as to whether the exhibits were actually admitted (the arbitrator thought at least one was), there can be no prejudice as a matter of law. As noted above, resort to parol evidence is necessary only to establish or resolve an ambiguity. (*PV Little Italy*, *supra*, 210 Cal.App.4th at p. 156.) The arbitrator found paragraph 25 was unambiguous. She therefore had no occasion to rely on ABP's parol evidence about lack of negotiation of a point (i.e., a term different than 65 years) not reflected in the plain terms of the lease.

The second purported fraud was that ABP avoided producing "emails needed to cross-examine [Lynch] based on

_____

[11]      The arbitrator stated she was not considering the content of these documents at the time they were first identified, before any foundation had been laid. It is not clear she intended to foreclose consideration of the documents ever. In the broader context of advising the parties of how to assert objections to documents, and in response to an objection that a different exhibit (200) lacked foundation and constituted hearsay, she stated: "Your job, when something comes up, is to voice your objection. I will then . . . make a determination as to whether I'll consider it or not." After Marina's counsel asked whether the arbitrator would consider its objections to exhibits 201 and 206 at that time, she responded: "Well, 201 and 206, so far all I know about them is that these were the files that [ABP] obtained when the property was purchased. That's all I know. [¶] I'm not even considering anything that's in them. *So far nothing has been said.* So I think we need to move on." (Italics added.)

ABP's assertion that the emails were held by a third party over whom ABP had no control." ABP's invoices, submitted in the fee award phase—after issuance of the interim award but before issuance of the final award—reflected legal work performed by ABP pertaining to the processing of Lynch's e-mail files prior to the arbitration hearing.

ABP unhelpfully gives this issue scant attention. We nevertheless must consider whether the record supports Marina's contentions.[12] We find Marina fails to make a clear and convincing showing of fraud.

The billing records show ABP had possession of some "A. Lynch email files" not later than February 2, 2023. However, there were two subpoenas for her e-mails at issue: one to Lynch herself, which ABP agreed to, and a second to Watt Cos., a third party, which ABP did *not* agree to. Marina asked the arbitrator to order the subpoena, asserting that ABP claimed Watt Cos. records were not under its control. ABP opposed the subpoena on the grounds that the requested records were not relevant, that Marina was engaged in a "fishing expedition," and that Marina was acting in bad faith "as a vehicle for further litigation."

The arbitrator denied Marina's request, finding Marina had established neither the relevance of the documents as required by a prior discovery order nor met the standard under a prior discovery stipulation of showing the e-mails it sought were on the Watt Cos. server, despite having explored the issue in a deposition.

---

[12] Contrary to Marina's repeated contentions in its reply brief, "a respondent does not concede contentions asserted in an appellant's opening brief by failing to address them." (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 227, fn. 9.)

Marina's claim of fraud has a similar problem. To accept Marina's premise of fraud in ABP saying it did not have control over or custody of Watt Cos. e-mails (a position apparently never taken to the arbitrator),[13] we would have to have evidence that the e-mails ABP reviewed in February 2023 were from the Watt Cos. server. The record does not so reflect. Indeed, it is equally plausible that the e-mails ABP had were different e-mails, including those embraced within the subpoena issued to Lynch personally. Marina's evidence of fraud is therefore not clear and convincing. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998 [clear and convincing standard " 'requires a finding of high probability' "].)

We note Marina failed to avail itself of one, if not two, opportunities to further develop a record on this issue. First, it could have raised it substantively with the arbitrator. It discovered the purported fraud after she issued her interim award but before she issued her final award. (See *Lonky v. Patel* (2020) 51 Cal.App.5th 831, 846 [statutory limitations on arbitrator's authority to modify award inapplicable to interim award that contemplated further proceedings on attorney fees and costs].) However, it only complained about the issue in a footnote opposing ABP's fee and cost request. Second, there is authority that may have supported a request for discovery in connection with its motion to vacate. (See *Bouton v. USAA Casualty Ins. Co.* (2008) 167 Cal.App.4th 412, 428.) Marina made no such request.

---

[13] Cited record evidence of the "no custody and control" claim exists only in statements by Marina's counsel, not by ABP's.

**D. The Record Does Not Show Misconduct by the Arbitrator Within the Meaning of Section 1286.2, Subdivision (a)(3)**

In relevant part, section 1286.2 requires vacatur of an arbitration award when "[t]he rights of a party were substantially prejudiced by misconduct of a neutral arbitrator." (§ 1286.2, subd. (a)(3).) " 'Misconduct' in this context includes actions that create a reasonable impression of possible bias." (*FCM Investments, LLC v. Grove Pham, LLC* (2023) 96 Cal.App.5th 545, 553 (*FCM*), citing *Betz v. Pankow* (1995) 31 Cal.App.4th 1503, 1507–1508 (*Betz*).) " 'An impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased *for or against a party for a particular reason.*' " (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 389 (*Haworth*), quoting *Betz, supra*, at p. 1511.)

The test for bias-based misconduct is "whether a hypothetical reasonable person (i.e., a disinterested, well-informed, thoughtful member of the public) would form *an impression of possible bias* on the part of the arbitrator." (*FCM, supra*, 96 Cal.App.5th at p. 555.) " 'The "reasonable person" is not someone who is "hypersensitive or unduly suspicious," but rather is a "well-informed, thoughtful observer." ' [Citations.] '[T]he partisan litigant emotionally involved in the controversy underlying the [arbitration] is not the *disinterested objective observer* whose doubts concerning the [arbitrator's] impartiality provide the governing standard.' " (*Haworth, supra*, 50 Cal.4th at p. 389 [addressing arbitrator's failure to disclose facts which might have cast doubt on his impartiality].)

*Betz* involved an allegation of bias based on what the court called "[a] frequent cause for an impression of possible bias"— "the existence of a present or past business relationship between the arbitrator and a party, its counsel or a witness." (*Betz, supra*,

31

31 Cal.App.4th at pp. 1508–1509.) The *Betz* arbitrator was "formerly a partner in a law firm during a period when the firm represented a business entity in which one of the arbitrating parties had a financial and/or leadership interest . . . ." (*Id.* at p. 1505.) The *Betz* court found vacatur inappropriate on this ground because the arbitrator "was not acquainted with the party and unaware of the party's representation by his former law firm." (*Ibid.*; see also *id.* at p. 1511.)

*FCM* was a contract dispute which turned on the credibility of one witness—a principal of one of the contracting parties. (*FCM*, *supra*, 96 Cal.App.5th at p. 555.) In the award, the arbitrator found the witness not credible because she used an interpreter at the arbitration hearing—something the arbitrator called a "deceptive ploy," given evidence the witness engaged in sophisticated business transactions and had lived for decades in the United States. (*Id.* at p. 547.) The appellate court determined the award gave rise to a "reasonable impression of possible language bias on the part of the arbitrator" and therefore had to be vacated. (*Id.* at p. 560.)

Here, Marina does not identify any " '*particular reason*' " (*Haworth*, *supra*, 50 Cal.4th at p. 389, quoting *Betz*, *supra*, 31 Cal.App.4th at p. 1511) the arbitrator was purportedly biased against it. Instead, it asks us to infer bias because, according to Marina, "(i) . . . the Arbitrator acted in ways that would present an impression of bias to any objectively reasonable person, and (ii) the Arbitrator tacitly admitted to having prejudged the outcome before the evidence was in."

Starting with the latter, the statement purportedly evidencing the arbitrator's prejudgment was made on May 26, 2023, the fifth day (of seven) of the hearing. In the context of explaining the problems with the declaration Marina had submitted from Rocchi, the arbitrator said: "I have gone down this path of ambiguity largely because of the differing aspects of

32

[paragraph 25's heading] and the [paragraph] itself. And I have allowed everybody to go down this path, and we have been here a week going down that path. [¶] *I will not tell you where I am going with this because it's not the appropriate time.* I'm going to let everybody put on the evidence that they think they need to put on here." (Italics added.)

This statement does not establish bias or impartiality requiring vacatur. First, "the manner in which evidence was weighed or the mental processes of the arbitrators in reaching their decision are not subject to judicial review." (*Betz v. Pankow* (1993) 16 Cal.App.4th 919, 927.) Second, "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of [proceedings], do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (*Liteky v. United States* (1994) 510 U.S. 540, 555 (*Liteky*).)

To the extent the arbitrator's statement reflected she had formed a view of whether parol evidence would support Marina's interpretation of paragraph 25, she was already well-versed in the language of the paragraph, understood the way Marina wanted it interpreted,[14] and had heard considerable evidence.

---

[14] It bears noting Marina had "an uphill battle" on its interpretation of paragraph 25. Marina's counsel conceded as much in the trial court. Marina's initial litigation position tacitly

Even if she had become "hostile" to Marina's case by this point, she had already heard ample evidence and we think her recognition that it was not yet appropriate to reach a judgment and her commitment to hearing all the parties' admissible evidence show a fair judgment remained in prospect.

The assortment of other conduct Marina alleges shows bias is as follows:

(1)     the arbitrator refused to order ABP to revise its witness list to include summaries of anticipated testimony in accordance with JAMS rule 20(a) based on the arbitrator's satisfaction that ABP had complied with her scheduling order;

(2)     the arbitrator misconstrued her scheduling order to allow her to entertain ABP's objections to Marina's exhibits after the start of the hearing;

(3)     the arbitrator ruled "unevenly" on objections to exhibits and testimony, sustaining 80 percent of ABP's objections but only 28 percent of Marina's;

(4)     the arbitrator directed additional production by Marina because it asserted affirmative defenses, without requiring ABP (which had not asserted affirmative defenses) to expand its production; and

---

recognized this when it claimed mutual mistake, in the absence of which the parties would have specified a 99-year term. After abandoning that in favor of its ultimate ambiguity theory, Marina introduced its position—in its baseball arbitration position statement—by claiming "[paragraph] 25 means exactly what *its heading* states." (Italics added.) Its primary reliance on the heading revealed the weakness of its position in light of paragraph 28A: "[Headings] *shall not be considered or referred to in resolving questions of interpretation or construction.*" (Italics added.)

(5)     the arbitrator mishandled ABP's fee motion in a variety of ways.

Evaluating Marina's various contentions would require us to (i) review the arbitrator's discovery rulings, evidentiary rulings, interpretations of JAMS rules, and her own orders; and (ii) conclude she erred. We decline to do so. First, this would amount to a backdoor review of the arbitrator's rulings, in contravention of *Moncharsh* and *Greenspan*. (See *Moncharsh, supra*, 3 Cal.4th at p. 12 [" 'it is within the power of the arbitrator to make a mistake either legally or factually' "]; *Greenspan, supra*, 185 Cal.App.4th at p. 1439.) Second, even if we were to agree with Marina that the rulings described were erroneous, erroneous rulings are not evidence of bias. (Cf. *People v. Baker* (2021) 10 Cal.5th 1044, 1088 ["a court may be wrong, even repeatedly, without revealing any partiality"]; *Severson & Werson, P.C. v. Sepehry-Fard* (2019) 37 Cal.App.5th 938, 952 ["A trial court's rulings against a party, even if erroneous, do not, by themselves, support a charge of bias."].)

Nevertheless, it bears note that Marina paints a misleading portrait of the arbitrator's demeanor.

For example, Marina says the arbitrator was "partial to ABP and hostile to Marina" because, after ABP raised the issue, she admonished Marina's counsel for their " 'improper and insensitive' " filing on a religious holiday the night before a hearing, even though the arbitrator filed her tentative on the same holiday. What Marina fails to mention is that its submission was responsive to a reply ABP had filed 10 days earlier and that the arbitrator nevertheless carefully considered the content of Marina's submission. In any event, "[n]either strained relations between a judge and an attorney for a party nor '[e]xpressions of opinion uttered by a judge, in what he conceived to be a discharge of his official duties, are . . . evidence of bias or prejudice.' " (*Roitz v. Coldwell Banker Residential*

35

*Brokerage Co.* (1998) 62 Cal.App.4th 716, 724; see also *Liteky, supra,* 510 U.S. at p. 555 ["judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge"].)

Further examples lie in its complaint that the arbitrator did not give it opportunities to respond to adjustments to be made to ABP's fee award after a full hearing on the matter. A review of the transcript shows the arbitrator gave reasoned responses to Marina's requests, evincing no bias or unfairness. The arbitrator found Marina did not need an opportunity to oppose ABP's revised fee statements she ordered prepared because her tentative called for a "simply mechanical" revision to its prior submitted statements. Marina contends ABP thereafter "began making filings urging the Arbitrator to reconsider and grant it more fees," but directs us to no such filings in the record. What Marina does cite is the arbitrator's final order that shows she took seriously Marina's objections to ABP's fee request and made significant adjustments. Among other things, the final order substantially reduced increases to hourly rates charged by ABP's lawyers and took another $100,000 off ABP's request due to block billing.

Marina's unsupported recitation of the instances it purports show prejudice reflect its perspective as that of a " 'partisan litigant emotionally involved in the controversy' " and not a reasonable, disinterested observer. (See *Haworth, supra,* 50 Cal.4th at p. 389.) That perspective cannot support vacatur. (*Ibid.*)

Marina's characterizations notwithstanding, the arbitrator was respectful towards and patient with Marina's counsel, even as counsel repeatedly pressed issues she had already ruled on (e.g., the applicability of evidentiary rules) and addressed the arbitrator in ways that made her feel personally attacked. She

helped Marina by admitting evidence objected to by ABP, including by accepting some facts as "common sense" and questioning witnesses herself to help break through ABP's objections. She consistently gave both sides due opportunity to argue disputed issues. Yes, Marina was often on the losing side, but allowing this to serve as prima facie evidence of bias would create a ground for vacatur of every arbitral award and upend the policy favoring finality embodied in section 1282.6. Using relative success of objections as a proxy for arbitrator bias is a nonstarter: any arbiter must rule on the merits every time, not try to achieve parity in the parties' objection outcomes.

Though stated in a different context, it applies with equal force here: "The mere fact that a decision was reached contrary to a particular party's interest cannot justify a claim of bias, no matter how tenaciously the loser gropes for ways to reverse his misfortune. While this proposition may appear self-evident, [Marina's] enumerated contentions collapse to little more." (*Marcus v. Director, Office of Workers' Compensation Programs, U. S. Dept. of Labor* (D.C.Cir. 1976) 548 F.2d 1044, 1051.)

## III. ABP's Attorney Fees and Costs on Appeal

ABP requests its fees and costs on appeal. Attorney fees, "if recoverable at all—pursuant either to statute or parties' agreement—are available for services at trial and on appeal." (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 637.) Marina does not contend the superior court erred in awarding ABP its fees and costs below nor does it respond to ABP's request for fees and costs on appeal. We will remand for the limited purpose of determining those reasonable fees and costs to which ABP is entitled pursuant to paragraph 23 of the ground leases. (See *Lindelli v. Town of San Anselmo* (2006) 139 Cal.App.4th 1499, 1517 [determination of the amount of fees "is a factual issue more properly considered in the first instance by the trial court on remand"].)

## DISPOSITION

The judgment is affirmed. Costs pursuant to California Rules of Court, rule 8.278, are awarded to ABP. This matter is remanded to the superior court for the limited purpose of considering any request for contractual fees and costs ABP may choose to file.

RICHARDSON, J.

WE CONCUR:

CHAVEZ, Acting P. J.

GOORVITCH, J.*

---

\*     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.